**GENERAL BUILDERS SUPPLY COMPANY, et al., Plaintiffs, Appellants,**

v.

**RIVER HILL COAL VENTURE, et al., Defendants, Appellees.**

**No. 85–1957.**

United States Court of Appeals, First Circuit.

Argued March 6, 1986.

Decided July 3, 1986.

Robert D. Cultice with whom Carl K. King, P.C., Louis J. Scerra, Jr. and Goldstein & Manello, Boston, Mass., were on brief, for plaintiffs, appellants.

Edward Notis-McConarty with whom Kathleen A. Bryan and Hemenway & Barnes, Boston, Mass., were on brief, for defendant, appellee Gerald T. Reilly & Co.

Vincent M. Amoroso with whom Robert T. Gill and Parker, Coulter, Daley & White, Boston, Mass., were on brief, for defendant, appellee Rich, May, Bilodeau & Flaherty.

Before CAMPBELL, Chief Judge, TOR-

RUELLA, Circuit Judge, and MALETZ,* Senior Judge.

TORRUELLA, Circuit Judge.

This case is before us on an appeal by plaintiffs, hereinafter referred to collectively as "the investors," from an order of the United States District Court for the District of Massachusetts awarding defendant/appellees Rich, May, Bilodeau & Flaherty, Francis M. Percuoco and Gerald T. Reilly & Co., summary judgment on the ground that the investors' claims under federal securities laws are time barred. The facts which gave rise to the complaint are as follows:

In March 1978 the appellants began negotiations for the purpose of investing in the River Hill Coal Venture, a coal mining venture located in Tuscarawas County, Ohio. Robert Goldberg, promoter of the venture, organized the project so that it was to be sold in the form of 34 units at a cost of $30,000 per unit. The River Hill venture was presented to the investors and highly recommended by their financial advisor and accountant of many years, Reilly & Co., and specifically its agent Percuoco, the individual with whom appellants had personally dealt. Percuoco counseled the investors, encouraging involvement in the venture because he knew and trusted the individuals who had formed River Hill. He stated that Reilly & Co. had reviewed the documents describing the investment and found them to be in good order. Percuoco failed to inform them, however, that he would receive a commission for selling the units. Percuoco provided each investor with a copy of the River Hill offering memorandum, 217 pages in length, which described the venture and its operation in detail. Besides describing the sale of the units and the purchase plan,[1] the offering memo contained, *inter alia*, such diverse documents as the engineering report; the mining contract; a form of opinion of tax

counsel; information on risk factors, such as tax consequences, pro forma financial analysis, and numerous exhibits.

The venture was to operate in the following manner: River Hill had obtained from the Washington Coal Trust, an affiliate of the venture manager, River Hill Coal Corp., a sublease whereby it would have all of the rights to mine coal in the subleased area until March 31, 1985, or a period of about seven years from the closing. Under the terms of the sublease, River Hill was required to pay minimum annual royalties of $2,040,000; however, only one quarter of such royalties had to be paid annually in cash during the first two lease years of 1978 and 1979, with the balance payable by non-recourse 4% promissory notes maturing on March 15, 1985. The offering memo predicted a delay in the commencement of mining operations beyond the closing date. The pro forma financial analysis was based upon an estimated commencement date of March 31, 1979—one year after the closing. Such a delay could be reasonable in light of all the preliminary work which had to be accomplished prior to actual mining. The offering memo stated, among other things, that the venture had to first obtain various permits from the state of Ohio, perform substantial development work in order to "face up" the mine in preparation for deep mining, obtain insurance to cover tort liability, and hire a professional mining engineer to render advice on the mining operations and the marketing of coal.

The projections for taxable income estimated that River Hill would produce $10,000,000 in coal sales and would yield a net income of $2,933,200 during the fiscal year ending March 31, 1980.

In September 1979, each investor received a newsletter from Goldberg, in his capacity as president of River Hill Corp., advising them that due to recent Environment Protection Agency regulations, he did

---

* Of the United States Court of International Trade, sitting by designation.

**1.** Each investor would be required to make an initial cash payment of $15,000 per unit at closing and a subsequent payment of $15,000 on or before March 31, 1979. The closing was expected to occur on May 1, 1978, unless extended to a date no later than July 1, 1978.

not expect a market to develop for River Hill's high sulphur coal for about 12 to 18 months. He noted that if the market remained "soft" in 1980, they might be provided additional property with superior reserves. Other newsletters dated March 1980 and October 1980 informed them of actions being taken to promote the sale of coal. None of the newsletters made any mention of the actual commencement of mining or, for that matter, gave any indication that preparation for mining had begun.

Upon receiving the newsletters, each investor contacted Percuoco to obtain his view on the information contained therein. Each time Percuoco corroborated the information and assured the investors that action was being taken to end the delay. In August 1980, investor Katz, on his own behalf and that of General Builders, met with Goldberg to inquire about the status of the investment. Goldberg told him that the market for coal was improving and that River Hill was considering the possibility of a cleaning plant to reduce the sulphur content of the coal. In August 1981, two other investors, in an attempt to secure additional information, wrote a letter to the law firm then representing Goldberg in the formation of coal mining ventures.

The investors allege that they were not alerted to the possibility of fraud until the fall or winter of 1981 when an article appeared in the Boston Globe reporting Goldberg's suspension from doing business in West Virginia and of an investigation of Percuoco's dealings by the Massachusetts division of securities for possible violations of the securities laws.

In December 1981, each investor was notified by the Internal Revenue Service that it was disallowing the income tax deductions taken in relation to the River Hill investments.

It was not until November 15, 1983 that the investors filed this action seeking to recover damages for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission, and for common law fraud and legal malpractice.[2] It was their contention that River Hill never mined coal and never intended to do so, and that the accountants and law firm conspired with Goldberg and River Hill to defraud them. A first amended complaint filed shortly thereafter added an additional plaintiff.

On March 1, 1984, the district court heard oral arguments on defendants' motion to dismiss for failure to plead fraud with particularity and for failure to state a claim upon which relief could be granted pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). In response to the defendants' allegation that the investors' suit was time-barred, the court expressed serious doubt as to whether the complaint alleged sufficient facts to justify application of the doctrine of equitable tolling. The court specifically directed the investors' counsel to "amend to get your strongest facts in. Don't wait until the court rules against you on this point." The court repeatedly expressed concern about the plaintiffs' failure to state what positive action they took to learn what was happening and in what manner they were blocked from finding out.

In response to the court's directive, the investors filed a second amended complaint. The defendants renewed their motions to dismiss, asserting that this new complaint did not cure the defects of the earlier one.

■ On June 21, 1984, the court found that the revised complaint sufficiently informed the defendants of the claims against them. The court indicated, however, that a question remained concerning compliance with the statute of limitations. On this issue the court concluded that the statute began to run prior to receipt by the investors of their deduction disallowance notices from the IRS. Because the parties had referred to matters outside the plead-

---

**2.** Sections 10(b), 20(a) and Rule 10b–5 can be found at 15 U.S.C. § 78j(b), 15 U.S.C. § 78t(a) and 17 C.F.R. § 240.10b–5, respectively.

ing, the court treated the motions as motions for summary judgment. It specifically found that the investors had not alleged acts of due diligence regarding their inquiry into the status of their investment. The court concluded that a question to be determined was whether the plaintiffs had received sufficient "storm warnings" of possible fraud before November 15, 1980, the date from which the three year statute of limitations would run,[3] thereby placing them on notice to inquire further and triggering a duty to exercise due diligence. If such were the case, their action would be time-barred and summary judgment for defendants would be ordered.

Following a period of discovery on this issue, and the filing of additional documents and motions with the court, a hearing was held. In granting the motion, the court found that the plaintiffs had invested for the purpose of mining coal, and not as tax shelters. It characterized as "thunderstorm warnings" the fact that "there was no coal in prospect previous to November of 1980, certainly during 1979, from the reports that they were receiving indicating that expenses that would have to be incurred previous to commencing the mining had not been paid." In its order on plaintiffs' motion to amend the findings of fact, to alter or amend judgment and for reconsideration, the court reversed its finding on the motive for investing, but stated that, nonetheless, even if the investment was made solely as a tax shelter, plaintiffs were still placed on inquiry notice for the reasons stated by the court in its prior order. That is, even if the purpose in making this investment was solely as a tax shelter, they would be entitled to tax deductions only if they entered into the venture for the purpose of ultimately realizing a profit from coal mining, rather than merely to obtain tax benefits.

It is well established in this circuit that the statute of limitation applicable to claims under Section 10(b) and Rule 10b–5 begins to run when an investor, in the exercise of reasonable diligence, discovered or should have discovered the alleged fraud. *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir.1978); *Sleeper v. Kidder, Peabody & Co. Inc.*, 480 F.Supp. 1264, 1266 (D.Mass.1979), *aff'd mem.*, 627 F.2d 1088 (1st Cir.1980). Whether a plaintiff should have discovered the fraud is an objective question, and courts must determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud. *Hupp v. Gray*, 500 F.2d 993, 997 (7th Cir.1974). It is appellant's contention that while the plaintiff must ultimately prove his compliance with the statute of limitations, this circuit has never compelled the plaintiff to plead such compliance at the risk of losing his opportunity to adduce evidence of due diligence at a later stage of the proceeding. Citing *Valles Salgado v. Piedmont Capital Corp.*, 452 F.Supp. 853, 856 (D.P.R.1978), appellants argue that the court in that case rejected defendants' contention that the plaintiffs had failed to state a claim under Section 10(b) and Rule 10b–5 because they had failed to plead compliance with the statute of limitations.

While the district court's discussion of the difference in the pleading requirement claims brought under Securities and Exchange Act of 1934 as compared to the Securities Act of 1933 is of general informative value, *Valles Salgado* is otherwise irrelevant to the present controversy as the issue of compliance with the statute of limitations was never raised in that case, and thus that court made no findings on that matter. In the case at bar, however, defendants raised it in their motion to dis-

---

**3.** Section 10(b) of the Securities and Exchange Act of 1934 has no statutorily prescribed limitations period. The federal court must, therefore, look to the limitations period applicable to the analogous cause of action under state law to determine the period limiting actions brought under this section and its correlative rule. *Cook*

*v. Avien, Inc.*, 573 F.2d 685, 694 (1st Cir.1978). In this case the three year period set by Mass. Gen.Laws Ann. ch. 260, § 2A, applies to such securities fraud actions. *Id.; Janigan v. Taylor*, 344 F.2d 781, 783 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).

miss, and as appellants themselves point out:

> "[T]he federal courts have placed the burden of proof on the plaintiffs when questions of limitations arise under § 10(b) *once the defendant has pleaded the statute of limitations.*"

*Cook, supra,* at 695 (emphasis added).

■ We have before us a situation where the plaintiffs were alerted to the fact that the statute of limitations was in issue; the court specifically directed them to address the issue of due diligence by warning them that they should not wait for an adverse ruling before submitting their strongest case. We do not believe that, in the face of such a directive, the plaintiffs can ignore the court's order and stand on the ceremony of technicalities when it is obvious to all that this question is central to a decision of the issues raised. The investors' arguments concerning the amending of the pleading vis-à-vis their burden of proving compliance amounts to a distinction without a difference once ordered by the court to present the pertinent facts. *See Morgan v. Koch,* 419 F.2d 993, 999 (7th Cir.1969).

Appellants argue, in the alternative, that their second amended complaint did plead compliance, including due diligence in trying to discover the fraud, and that there are genuine issues of material fact relating to their exercise of diligence. They have submitted affidavits detailing the acts which they consider to have tolled the statute. The investors base their position on the continuing assurances of Percuoco, their trusted financial advisor of many years, one meeting with Goldberg in August 1980, and one letter sent to the law firm representing the venture.

Appellees do not dispute that these efforts occurred. Thus, these factual issues are not in dispute. Assuming, *arguendo,* that these facts could be gleaned from the second amended complaint or that the district court should have considered them and failed to, we nonetheless find that, as a matter of law, they are insufficient to constitute reasonable diligence to uncover the fraud. *See Sleeper v. Kidder, Peabody & Co., Inc., supra,* (although the issue of reasonable diligence is factually based, it may be determined as a matter of law where the underlying facts are admitted or established without dispute).

While the existence of a fiduciary relationship is one factor which a court should consider in determining whether a plaintiff has exerted due diligence, a mere allegation that such a fiduciary relationship existed is alone not necessarily determinative. We must also consider other factors, including the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants. *Hupp v. Gray, supra,* at 997.

Appellants repeatedly argue that the long-standing relationship with Percuoco, during which he gave reliable advice, and the trust placed in him which was never before shaken, overwhelmingly warrant a finding that there was no lack of due diligence on their part by reason of their reliance on his reassurances that the venture newsletters contained accurate information.

■ In this case, however, Percuoco was not a wholly disinterested advisor, a fact known by appellants. He was the person who brought the coal venture to appellants' attention, vouched for the characters of the organizers and, more or less, encouraged the appellants to invest their funds in this particular project. A reasonable person would easily recognize that if Percuoco's advice in the matter was even innocently incorrect, he might try to cover himself in the hope that the investment situation might turn around later, and that their money and his reputation would be saved. Additionally, the newsletter information may well have been correct. The market for coal may have been soft; Goldberg may have been investigating the use of a coal cleaning plant. But the bottom line was that no mining was being done, and more alarming, no preparations were being made to begin mining in the event that the market should become more favorable. That is, even if all the problems causing the

delays suddenly disappeared, mining could not begin.[4]

Plaintiffs' participation as joint venturers gave them a unique opportunity to adequately investigate the true status of their investments. Under the express terms of the operating agreement:

"The Venture Manager [would] cause accurate books of accounts to be kept, and an accurate record of the operation of the Property and all transactions conducted on behalf of the Participants. Separate accounts [would] be maintained for each participant. Such books of account and other records of the Venture Manager [would] be available to any participant at any and all times during normal business hours."

Given such a situation as we have here, the investors' due diligence burden goes beyond the duty to make a reasonable inquiry. An investor must also " 'apply his common sense to the facts that are given to him' in determining whether further investigation is needed." *See Cook, supra,* at 696 n. 24 (quoting Note, *The Due Diligence Requirement for Plaintiffs under Rule 10b–5,* 1975 Duke L.J. 753, 779). Considering that Percuoco was the "broker" in their purchase of the units, and Goldberg was the promoter and president of the venture manager corporation, it behooved the investors to look beyond the personal assurances of these two persons. It is clear that with the power available to make their own inspections and evaluations, their discovery efforts must be characterized as minimal.

Appellants contend that there are genuine issues of material fact as to when the statute of limitations began to run on their cause of action. Our review of the record leads us to conclude, as did the district court, that there are no material facts in issue here. The issues here arise from legal conclusions which can be drawn from the undisputed facts.

The issue before the district court was, therefore, did the statute of limitations begin to run before November 15, 1980, three years before the date on which this action was filed. Otherwise stated, were the investors given adequate "inquiry notice" before November 15, 1980? *See Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir.) (the question of when alleged wrongdoing should have been discovered may be decided as a matter of law only when uncontroverted evidence irrefutably demonstrates that plaintiff should have discovered the fraudulent conduct outside of the limitations period), *cert. denied,* —— U.S. ——, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984). Although appellants stress that it was the offering memo itself that emphasized the probability of delay in the actual mining, they overlook two important facts which gave them ample warning prior to November 15, 1980. First, almost a year and a half had passed since the one year estimated delay date on which mining was to begin, and upon which the financial projections were based. This alone should have alerted them to the fact that something was amiss. Second, River Hill had failed to obtain mining permits or insurance, and had not begun any development work on the actual mining site. Given that the sublease on the mine site had already run for two and a half years and was due to expire in 1985 and mining could not begin until the preparations were made, it should have been obvious to the investors prior to the date in question that there were serious economic problems with their investment. Even appellants' argument that appellees fraudulently concealed their intent not to mine coal fails to address the glaring fact that the clock was ticking away and the project was standing still.[5]

---

4. There are no allegations that either Goldberg or Percuoco hid the fact that none of the necessary preliminary expenses were being incurred or that the preparatory work had not started.

5. Appellants point to newsletters, reports and the assurances by Percuoco as to the truth of their content as acts of fraudulent concealment. We disagree. If anything, this information should have further alerted the investors to the fact that no progress was being made. Additionally, their argument of fraudulent concealment as tolling the statute is meritless because they have failed to meet the requirement of due

**14**

We, therefore, find that the district court's conclusion that the statute of limitations began to run before November 15, 1980, and that this action is time-barred, is supported by the record.

*Affirmed.*

diligence until discovery of the facts. *See Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985); *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975).