**COOPERATIVA de AHORRO Y CREDITO AGUADA,**
Plaintiff,

v.

**KIDDER, PEABODY & CO.; Paine Webber Incorporated; Ramon M. Almonte, Jane Doe, and the property partnership existing between them, Defendants.**

Civ. No. 89–1706 (JAF).

United States District Court,
D. Puerto Rico.

Sept. 4, 1992.

Roberto Boneta, Munoz Boneta Gonzalez Arbona Benitez & Peral, San Juan, P.R., for plaintiff.

Richard Graffam, Nestor Mendez-Gomez, McConnell Valdes Kelley Sifre Griggs & Ruiz-Suria, San Juan, P.R., for Kidder Peabody.

Harry E. Woods, Woods & Woods, San Juan, P.R., for Almonte and wife.

Guillermo J. Bobonis, Bobonis Bobonis & Rodriguez Poventud, San Juan, P.R., for Paine Webber.

## OPINION AND ORDER

FUSTE, District Judge.

We have before us plaintiff's Fed. R.Civ.P. 60(b)(6) motion for reconsideration of this court's decision of October 31, 1991. *See Cooperativa de Ahorro v. Kidder Peabody & Co.*, 777 F.Supp. 153 (D.P.R.1991). There, we found plaintiff's securities law claims time-barred.

The motion for reconsideration makes reference to the recent passage of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("the Act"). Pub.L. No. 102-242, 105 Stat. 2236 (1991). Section 476 of the Act, 105 Stat. at 2387, amends section 27A of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa-1, and overturns the retroactive effect of the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).[1] Plaintiff claims that if we apply section 476 of the Act and Puerto Rico law, the securities claims are not time-barred. Defendants claim that section 476 is unconstitutional and, therefore, the court should follow its original decision under *Lampf.*

We now decide that under section 476 of the Act and Puerto Rico law, the securities claims are time-barred. We do not reach the constitutional argument.[2]

---

**1.** The *Lampf* decision, which established a federal statute of limitations for section 10(b) actions, 15 U.S.C. § 78j, was given retroactive effect by a companion case, *James B. Beam Distilling Company v. Georgia*, —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991).

**2.** The courts which have found section 476 to be constitutional include: *In re American Continental Corporation*, 140 F.R.D. 425 (D.C.Az.1992); *Adler v. Berg Harmon Associates*, 790 F.Supp. 1235 (S.D.N.Y.1992); *Brown v. Hutton Group*, 795 F.Supp. 1307, (S.D.N.Y.1992); *Axel Johnson, Inc. v. Arthur Andersen & Co.*, 790 F.Supp. 476 (S.D.N.Y.1992); *In re Melridge, Inc.*, No. 87-1426-JU, 1992 WL 58265, 1992 U.S.Dist. LEXIS 3477 (D.Or. March 20, 1992); *TBG, Inc. v. Bendis*, No. 89-2423-0, 1992 WL 80622, 1992 U.S.Dist. LEXIS 5940 (D.Kansas March 5, 1992); *Venturtech II v. Deloitte Haskins & Sells*, 790 F.Supp. 574 (E.D.N.C.1992); *Ayers v. Sutliffe*, No. C-1-90-650, 1992 WL 207235, 1992 U.S.Dist.

LEXIS 3219 (S.D.Ohio Feb. 11, 1992); *Bankard v. First Carolina Communications, Inc.*, No. 89-8571, 1992 WL 3694, 1992 U.S.Dist. LEXIS 53 (N.D.Ill. Jan. 3, 1992).

Those which have found section 476 to be unconstitutional include: *TGX Corp. v. Gaylor Simmons*, 786 F.Supp. 587 (E.D.La.1992); *Bank of Denver v. Southeastern Capital Group, Inc.*, 770 F.Supp. 595 (D.Col.1992); *Pacific Mutual v. First Republic Bank Corporation*, No. 3:91-CV-0441-H, 806 F.Supp. 108 (N.D.Tx.1992); *Treiber v. Katz*, 796 F.Supp. 1054 (E.D.Mich.1992); *Duldue v. Cigna Securities, Inc.*, No. 90-CV-72191 (E.D.Mich. filed May 15, 1992); *Plaut v. Spendthrift Farm, Inc.*, 789 F.Supp. 231 (E.D.Ky.1992); *Johnston v. Cigna Corporation*, 789 F.Supp. 1098 (D.Col.1992); *In re Brichard Securities Litigation*, 788 F.Supp. 1098 (N.D.Cal.1992); *Mancino v. International Technology Corp.*, No. 89-7244-RMT(Sx), 1992 WL 114436, 1992 U.S.Dist. LEXIS 5039 (C.D.Cal. March 11, 1992).

### Section 476

■ In section 476, Congress established that:

[a]ny private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991—

(1) which was dismissed as time barred subsequent to June 19, 1991, and

(2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991, shall be reinstated on motion by the plaintiff not later than 60 days after the date of enactment of this section.

We first consider if plaintiff's action satisfies the requirements of section 476. Plaintiff's action must fulfill four criteria: (1) it must have been filed before June 19, 1991; (2) it must have been dismissed after June 19, 1991; (3) it would have been timely filed under the pre-*Lampf* statute of limitations period; and (4) the plaintiff's motion for reconsideration must have been filed within sixty days of December 19, 1992. The plaintiff's action fulfills three of the requirements: it was filed on December 28, 1989, dismissed on October 31, 1991, and the motion for reconsideration was brought within sixty days on December 27, 1991. The determination that follows is whether the action "would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction."

### Timely Filing

■ This court first stayed the progress of the instant case in anticipation of the imminent resolution by the Supreme Court of the split which had developed between circuits which had adopted an analogous federal statute of limitations and those retaining the traditional practice of adopting a state statute of limitations for section 10(b) actions. *Cooperativa de Ahorro y Crédito Aguada v. Kidder, Peabody & Co.*, 758 F.Supp. 64, 70–71 (D.P.R.1991). Through the enactment of section 476, Congress required courts to apply "the laws applicable in the jurisdiction" where the court sits to cases arising before the decision in *Lampf* was handed down on June 19, 1991. We find that the law applicable in our jurisdiction before June 19, 1991 was the two-year statute of limitations contained in the Puerto Rico Securities Act, 10 L.P.R.A. § 890(e).[3] Therefore, because the last sale of securities occurred on December 16, 1986, *Cooperativa de Ahorro y Crédito Aguada v. Kidder, Peabody & Co.*, 758 F.Supp. 64, 72 (D.P.R.1991), plaintiff's suit, which was filed on December 28, 1989, is time-barred unless the statute of limitations was tolled.[4]

■ The First Circuit has adopted the federal doctrine of fraudulent concealment, which acts to toll a statute of limitations where there has been fraud. *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978). The last sale in this case occurred more than three years prior to the filing of the action. This exceeds the two-year statute of limitations discussed above. Under the doctrine of fraudulent concealment, the statute of limitations begins to run when "an investor, in the exercise of reasonable

---

3. Prior to June 19, 1991, the First Circuit had shown no indication that it was considering the rather radical step of adopting a federal limitations period for section 10(b) actions. Indeed, several recent district court opinions suggest that the rule of adopting state statutes of limitations was very much alive in the First Circuit before *Lampf*. *Slavin v. Morgan Stanley & Co., Inc.*, 791 F.Supp. 327 (D.Mass.1992); *Alton v. Prudential–Bache Secur., Inc.*, 753 F.Supp. 39, 41 (D.Mass.1990).

4. We now find that the two-year statute of limitations is a civil law caducity period ("plazo de caducidad"). The lapse of time extinguishes the cause of action. *Martínez v. Calzadilla*, 756 F.Supp. 78, 81–82 (D.P.R.1991); *Arrieta Giménez v. Arrieta Negrón*, 672 F.Supp. 46, 48–50 (D.P.R. 1987); *Fireman's Insurance Co. of Newark v. Gulf Puerto Rico Lines*, 349 F.Supp. 952, 957 (D.P.R.1972); *R.D. Farnsworth v. CRUV*, 289 F.Supp. 666 (D.P.R.1968). Notwithstanding the fact that we are facing a caducity term, we have considered the doctrine of fraudulent concealment adopted by the First Circuit only to find that even if a fraudulent concealment defense would be available in reference to a caducity term, plaintiffs knew or should have known of the problems affecting the junk bond market and more than two years elapsed between knowledge and the filing of the complaint.

diligence, discovered or should have discovered the alleged fraud." *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 11 (1st Cir.1986). "The doctrine of fraudulent concealment operates to toll the statute of limitations 'where the party injured by the fraud remains in ignorance of it *without any fault or want of diligence or care on his part* ... until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.'" *Cook v. Avien, Inc.*, 573 F.2d at 694. The requirement of diligence was defined by the First Circuit in *General Builders Supply Co.* as demanding that "[a]n investor must also 'apply his common sense to the facts that are given him' to determining whether further investigation is needed." *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d at 13 (quoting *Cook v. Avien, Inc.*, 573 F.2d at 696 n. 24). Within this framework, a complaint is timely filed if it is filed within two years of the date on which a reasonable investor has sufficient hints of fraud to prompt him to make a reasonably diligent inquiry.

■ To properly discuss the application of the doctrine of fraudulent concealment to the facts of this case we must first sketch out a short history of the junk bond market and highlight the role of plaintiff, Cooperativa de Ahorro y Crédito Aguada ("the Cooperativa"), in the purchase of the bonds. "Junk bond" is the term used to describe high yield debt securities with a credit rating that is lower than investment grade. In its 1980's manifestation, this investment instrument was developed by Drexel Burnham Lambert ("Drexel") in the person of Michael Milken.[5] As noted in our earlier opinion, the Cooperativa was a single branch savings and loan institution, operated by a Board of Directors and an Administrator. The Cooperativa's assistant manager was the individual who negotiated the purchase of the bonds from defendant Almonte. There is no claim that the assistant manager failed to follow the institution's procedures for investment decisions. The Cooperativa is a sophisticated institutional investor, not an ignorant investor. The Cooperativa claims that it sought unspeculative investments that provided a safe, moderate rate of return. Its claim in this case is that defendant Almonte led these sophisticated investors to believe that the Drexel Burnham Lambert Unit Trusts were safe and unspeculative. Looking at the facts in the light most favorable to plaintiff, and taking them as true, Fed.R.Civ.P. 12(b)(6), we find that in light of the massive public information that was available concerning the sponsoring by Drexel Burnham Lambert of these investment instruments called "junk bonds", the plaintiff, as a normally sophisticated institutional investor, had ample warning which would trigger a common-sense investigation and assessment of its investment.

At the time during which plaintiff bought its Drexel bonds, it was public common knowledge within institutional investment circles that, although gaining in respectability, the high yield bonds sold by Drexel were accompanied by an equally high risk, and were growing riskier as the volume of bonds issued grew.[6] Knowledge

---

**5.** Scott, *Junk Bonds Offer More Flavor than the Plain Vanilla Kind*, CHRISTIAN SCIENCE MONITOR, May 17, 1985 at B8 ("Drexel's rise to prominence as the preeminent junk bond dealer is predicated on Michael Milken's championing of these securities.").

**6.** Forsyth, *Heading for the Scrap Heap? Why Junk Bonds are Growing Riskier*, BARRONS, April 29, 1985 at 34; McGough, *Reaching for Yield*, FORBES, Sept. 16, 1985 at 91 ("But junk bond funds, unlike money market funds, bear substantial credit risks."); Bianco, *The Growing Respectability of the Junk Heap*, BUSINESS WEEK, April 22, 1985 at 66 ("Meanwhile, two recent academic studies are helping give new respectability to low-rated issues. The evidence indicates that junk bonds are more likely to default than are high-grade bonds. But up to now, junk bond investors have been handsomely—even excessively—compensated for the added risk."); Hector, *A Go–Go Insurer Adds Zest to Life*, FORTUNE, March 5, 1984 at 51 ("He is betting heavily on risky B– and BB-rated bonds—junk bonds, as Wall Street calls them."); Furlong, *Columbia S & L Thrives on Taking Risks*, LOS ANGELES TIMES, Oct. 20, 1985 at pt. 2 pg. 1 ("Spiegel doesn't dispute that junk bonds are risky; he merely says that the risk is worth the reward.").

of the risks was generally advised before investment: Mr. Dow, of the Dow Jones Stock Exchange, advised " 'First, do your homework.' " Scott, *Junk Bonds have more Flavor than the Vanilla Kind,* CHRISTIAN SCIENCE MONITOR, May 17, 1985 at B8. Before the market crash of 1987, there were various congressional attempts to legislate and regulate limits on the investment in and use of junk bonds.[7] Although there were different schools of thought concerning the advisability of investing in junk bonds all were in agreement that it was an investment accompanied by a high degree of risk.[8] Supporters of junk bond investment argued that sophisticated investors should be allowed the option of assuming a higher risk for the reward of a comparably higher yield.[9] Trouble in this risky junk bond market culminated with the market crash of October 19, 1987, which sent investors running to unload their junk bond investments.[10] The view that junk bonds were a questionable investment and a bad overall financial strategy appeared to have been amply confirmed well before the market crash. Then came the implication of the involvement of Drexel in insider trading scandals.[11] All this caused the market for junk bonds to become very unstable. After this the market for junk bonds stabilized once more only to once again collapse in late 1988 when the value of all junk bond investments, including plaintiff's, began to drop rapidly. This culminated in the forced sale of plaintiff's investment in July of 1989 at a significant loss.

Clearly the junk bond market was designed for only the most sophisticated investors, although one of the concerns that developed was that so many relatively un-

7. *Junk Bond Guidelines Set,* NATIONAL MORTGAGE NEWS, April 13, 1987 at 1 (Federal Home Loan Bank Board issued guidelines which warned thrifts of risks inherent in junk bonds); Scott, *Junk Bonds have more Flavor than the Vanilla Kind,* CHRISTIAN SCIENCE MONITOR, May 17, 1985 at B8 ("[T]here is concern the savings-and-loans are developing an unhealthy appetite for these risky bonds. So Congress and state legislators are contemplating steps to curb junk bond financing."); Albert, *Fed Draws Fire for Expected Junk Bond Rule,* AMERICAN BANKER, Dec. 6, 1985 at 1 ("Earlier this week, the Fed was said to be planning to impose margin, or credit, requirements on certain junk bonds.").

8. Greene, *What, and whose, bottom line?* FORBES, Oct. 7, 1987 at 101 ("But despite the fact that junk bonds are every bit as risky as common stock, they are not considered equity, and the commitment junk bond holders make to a company's capital structure isn't considered in earnings per share."); Horowitz, *Salomon Moves to Bigger Role in Merchant Banking,* AMERICAN BANKER, April 30, 1987 at 3 ("Salomon has had a reputation of shying away from some of the riskier new areas, and its chief economist, Henry Kaufman, has publicly issued warnings about the economic dangers of junk bond financing.").

9. Carney, *Examine the Motives of Junk–Bond Critics,* BUSINESS WEEK, March 30, 1987 at 18 (states that investors in junk bonds are not "widows and orphans but some of the country's most sophisticated financial institutions. They have been amply compensated for taking on the additional risk of junk bonds."); Updegrave, *Smart Ways to Invest in a Risky Market,* MON-EY, October 1987 at 44 ("If you want to risk buying junk bonds to get a higher yield, select a diversified junk bond fund rather than the bonds of individual companies—and be prepared to switch out of the fund at the first signs of economic downturn."); *Junk Bonds,* THE WASHINGTON POST, April 11, 1985 at A20 ("But since the junk bonds bear low ratings, sophisticated investors presumably have been warned adequately of their risk and are prepared to assume it.").

10. Buchan, *Financial Markets in Turmoil; Investors Wince as Junk Bonds Follow Equities' Descent,* FINANCIAL TIMES, October 27, 1987 at sec. I pg. 2 ("In the process, junk bonds have been revealed for what some analysts always said they were; securities with all the risk of stocks and none of the rewards."); *U.S. Corporate Financing Pace seen Slowing,* REUTERS, Oct. 20, 1987 ("Investors sold junk bonds amid worries that a possible recession could lead to defaults among some highly leveraged issuers, analysts said."); Quint, *Tide is Out for Risky Debt,* NEW YORK TIMES, November 12, 1987 at D1 ("they generally agreed that its problems were compounded by the generally negative conditions for the entire market of high-yielding, high-risk issues known as junk bonds.").

11. Wayne, *Latest Corporate Takeovers Involve more than Just Paper,* THE NEW YORK TIMES, March 15, 1987 at sec. 4 pg. 26 ("The insider trading scandal, at first, had decimated the junk bond market, which has rebounded for nearly everything but high-risk hostile takeovers."); Ungeheuer, *Back in the Spotlight; As Boesky faces Sentencing, the Insider-trading Probe Rolls On,* TIME, December 21, 1987 at 55.

sophisticated investors bought junk bonds. Plaintiff, as an institutional investor belonged to that group of sophisticated investors. Obviously, plaintiff bought Drexel bonds between June and December of 1986 because of the attractive yields. Regardless of what it was told by Almonte before the sale, any reasonable sophisticated institutional investor should have recognized that it was investing in junk bonds.[12] If plaintiff bought $3.5 Million worth of Drexel bonds without determining their market rating and simply accepted Almonte's allegedly misleading representations that these were normal investments, then Cooperativa did not apply the common sense approach required by the doctrine of fraudulent concealment.

"An investor must 'apply his common sense to the facts that are given him' to determine whether further investigation is needed," so runs the language adopted by the First Circuit. *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d at 13. Common sense would dictate that an investment of $3.5 Million in what is generally regarded as a risky investment would require thorough investigation and constant monitoring. Any reasonable investor would have been on notice by the very nature of the investment and common sense required to do more than simply accept the representations of a broker.

We do not reach the question of whether the actions of plaintiff's broker, Almonte, constituted securities fraud within the meaning of section 10(b) of the Securities and Exchange Act. What we find is that plaintiff was under an obligation to conduct a reasonably diligent inquiry from the date of purchase of junk bonds and so the statute of limitations began to run on that date. If the statute of limitations began to run on December 16, 1986, the date of the last purchase, an action filed on December 28, 1989 is untimely. Even if one assumes for argument purposes that the general opinion in the financial community concerning junk bonds was not enough of a "storm warning," we would certainly find that the

market crash of October 19, 1987 and the subsequent shake-up of the junk bond market gave Cooperativa adequate warning to the effect that the financial instruments in which they invested were not the stable investments they had been represented to be. Once again, more than two years elapsed and nothing was done.

### Conclusion

The motion for reconsideration is DENIED. The securities claims are also time-barred under section 476 of the Act and Puerto Rico law.

IT IS SO ORDERED.

---

**12.** Auletta, *Boesky's World; It's not just a Few Bad Apples—The Whole Barrel is Rotten*, THE WASHINGTON POST, November 23, 1986 at D1

("To keep pace with Drexel's near stranglehold on junk-bond financing, investment banks now rush to even more speculative ventures.").