CAPE ANN INVESTORS, LLC, et al.

v.

Donald LEPONE, et al.

No. CIV.A. 00–CV–11531RGS.

United States District Court,
D. Massachusetts.

Oct. 31, 2001.

Reberta A. Kaplan, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for Cape Ann Investors.

Jeffrey B. Rudman, Andrea J. Robinson, Hale & Dorr, Boston, MA, for Donald E. Lepone, Robert F. Burns and Noreen Gottfredsen.

Thomas J. Dougherty, Ian D. Roffman, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Deloitte & Touche.

Reid M. Figel, Kevin B. Huff, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, Silvija A. Strikis, Kellogg, Huber, Hansen, Todd & Evans, Washington, DC, for James R. Young.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

STEARNS, District Judge.

On August 1, 2000, Cape Ann Investors LLC, brought a Complaint against three officers of the bankrupt NutraMax Products, Inc. (NutraMax) and its accountant, Deloitte & Touche LLP (Deloitte). The officer defendants were Donald Lepone, NutraMax's President and Chief Executive Officer, Robert Burns, NutraMax's Vice President and Treasurer, and Noreen Gottfredsen, NutraMax's Comptroller (the Officers). All defendants were alleged to have violated the Securities and Exchange

Act.[1]

### Procedural Context

On October 2, 2000, Deloitte filed a motion to dismiss. Cape Ann thereafter requested several extensions of time to respond. On March 8, 2001, the NutraMax Litigation Trust (the Trust), established in conjunction with NutraMax's Chapter 11 bankruptcy, filed an Amended Complaint as the assignee of Cape Ann's claims.[2] The Amended Complaint added three new plaintiffs. The Complaint as amended, in addition to Cape Ann's original claims, includes the pre-petition claims of NutraMax, as well as those of NutraMax's senior secured lenders (the Creditors), and certain unnamed "NutraMax shareholders who voted to approve the reorganization plan or elected thereafter to assign their claims to the Trust," who "purchased or otherwise acquired NutraMax common stock when its price was artificially inflated by defendants' false statements ..., as well as those ... who were induced to maintain their investment in NutraMax common stock by defendants' false statements" (the Electing Shareholders).

On April 2, 2001, Deloitte moved to dismiss the Amended Complaint, contesting among other grounds sufficiency of the pleadings under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u–4, and their timeliness under the one year statute of limitations. On April 23, 2001, Gottfredsen, appearing pro se, filed her own motion to dismiss, adopting Deloitte's statute of limitations and PSLRA arguments, while asserting lack of scienter .[3] On April 27, 2001, Lepone and Burns also asserted a statute of limitations defense.[4]

The motions to dismiss advance four distinct arguments. First, all defendants argue that the original Complaint is barred by the Security and Exchange Act's one year statute of limitations because, as a member of NutraMax's Board of Directors and Audit Committee, Cape Ann had "storm warnings" of the discrepancies in NutraMax's financials long before the Complaint was filed.[5] Second, all defen-

1. In addition to securities law violations, Deloitte was sued for professional malpractice, while all defendants were variously named in claims brought under Massachusetts state law.

2. On February 16, 2001, Cape Ann requested that it be given until May 16, 2001, to respond to the motion to dismiss or to amend its Complaint. The court denied the motion stating that "[t]here have been far too many extensions sought. Plaintiff will serve its opposition or amended complaint within twenty-one days."

3. Gottfredsen, in her two page Memorandum, argues that the Amended Complaint alleges that she "agreed to falsify NutraMax's books and records," when in fact, she "never *agreed* to falsify any of NutraMax's books and records."

   The final result of all financial books and records were based on the direction given to me by my superiors. I worked for Nu-

traMax for eleven years, longer than all the Officers and Directors. I always strived to be a hard working and an honest employee and individual. My only error here was staying with a Company that was drowning and following the directives given by my superiors.

4. Lepone and Burns additionally objected to the specificity of the pleadings with regard to the fraud claims, although on different grounds than those advanced by Deloitte.

5. In assessing the validity of the defendants' showing with regard to the statute of limitations, the court relies (as do the defendants for the most part) on the factual assertions of the Amended Complaint, on those documents referenced in the Complaint whose authenticity are not challenged, and on admissions contained in the plaintiffs' pleadings on file. *See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir. 2001).

dants argue that even if Cape Ann's assigned claims are timely, the Securities Act claims of the new plaintiffs are barred by the "relation back" provisions of Fed. R.Civ.P. 15(c).[6] Next, Burns and Lepone argue that the plaintiffs have not plead fraud with the requisite particularity. Finally, Deloitte argues that the allegations against it (which differ materially from those asserted against Burns and Lepone) are insufficiently plead.[7] On July 19, 2001, the court held a hearing focused on the arguments regarding the statute of limitations.

### The Amended Complaint

According to the Amended Complaint, since late 1997, Cape Ann, a significant NutraMax investor, held a seat on Nutra-Max's Board of Directors and Audit Committee. Amended Complaint, ¶ 138; see also Complaint, ¶ 18. On "November 28, 1997, Deloitte submitted a letter to the Audit Committee advising that, in the course of its 1997 audit, as in 1995 and 1996, it had identified a 'reportable condition,' ... related to NutraMax's procedures for inventory valuation, which had required an adjustment of $2.6 million at the end of the 1997 fiscal year." Amended Complaint, ¶ 85. Deloitte also "noted numerous other errors that were not adjusted, including under-accruals of various expenses and a failure to provide adequate reserves for uncollectible accounts receivable." Amended Complaint, ¶ 86. "Deloitte further observed that, ... Nutra-Max['s] ... use of cycle counting as a method of inventory control procedures continued to be flawed," and adverted to "other issues that affected the reliability, timeliness and control of NutraMax's fi-

nancial information." Amended Complaint, ¶¶ 87–88.

On December 15, 1997, "Deloitte advised NutraMax's Board of Directors that it had ·continued to observe deficiencies in Nutra-Max's inventory control .... [and that] the age of the Company's accounts receivables had increased significantly, a condition that held ramifications for compliance with NutraMax's agreements with Creditors." Amended Complaint, ¶ 90.

On November 24, 1998, during the course of the 1998 audit, Deloitte "notified NutraMax's Audit Committee that ... it had identified a substantial number of 'reportable conditions,' ... related to Nutra-Max's internal control structure and its operations, many of which involved issues that Deloitte had been aware of in previous years" including "valuing and controlling inventory." Amended Complaint, ¶¶ 99–100.

In January of 1999, NutraMax's Board of Directors voted to terminate Deloitte. In May of 1999, Arthur Anderson replaced Deloitte as NutraMax's accountant. Form 8–K, May 25, 1999. "The full extent of Deloitte's intentional misrepresentations—and of the misconduct of the Officer Defendants—came to light during 1999, when the Board of Directors hired a new Chief Operating Officer. Immediately upon his arrival, he noted the extreme inadequacy of [the Company's accounting software], the Company's accounting procedures, and the Company's internal controls. He also began to suspect that there might be irregularities in the Company's books and records. On his recommendation, the Board of Directors retained counsel to con-

---

6. The defendants do not dispute the substitution of Trust for Cape Ann as the assignee of the claims brought in the original Complaint.

7. Burns, Lepone, and Deloitte also argue that if the federal securities law claims are dismissed, the court should dismiss the companion state law claims on substantive and jurisdictional grounds.

duct an investigation." Amended Complaint, ¶ 107.

On August 18, 1999, NutraMax announced that it had replaced Lepone and Burns and that it would delay the release of its earnings reports for the quarter and for the nine months ending July 3, 1999. NutraMax also announced that it expected to restate its financials for the previous years. The next day, NutraMax's stock lost more than 40% of its value. Amended Complaint, ¶ 24. On October 15, 1999, the NASDAQ exchange delisted NutraMax's stock. On November 12, 1999, Deloitte announced that it was withdrawing its audit reports for the consolidated financial statements for 1996, 1997, and 1998. Amended Complaint, ¶¶ 25–26. On August 1, 2000, Cape Ann filed the original Complaint.

Counts I and II of the Amended Complaint are brought by the Electing Shareholders and assert violations of Rule 10b–5 against Deloitte and the Officers. Count III and IV are brought by the Electing Shareholders, the Creditors, and NutraMax, alleging common-law fraud and deceit against Deloitte and the Officers, respectively. Count V is brought by the Electing Shareholders and Creditors, alleging negligent misrepresentation against Deloitte. Count VI is brought by the Electing Shareholders, the Creditors, and NutraMax against all defendants, alleging violations of M.G.L. c. 93A. Count VII is brought by the Electing Shareholders, the Creditors, and NutraMax against Deloitte, alleging professional malpractice. Finally, Count VIII is brought by NutraMax against the Officers, alleging breach of fiduciary duty.

## Discussion

When considering a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theo-ry, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company,* 14 F.3d 697, 700 (1st Cir.1994). The complaint must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain a recovery under some actionable legal theory." *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996), quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 515 (1st Cir.1988).

The statute of limitations analysis involves two sequential steps. First, the court must determine if Cape Ann's original Complaint was timely-filed with respect to each of the named defendants. If the answer to that question is "no," the issue remains whether the claims of the late-arriving non-Cape Ann plaintiffs are nonetheless salvageable, as these plaintiffs stand in shoes different than those of Cape Ann.

A claim arising under Rule 10b–5 "must be commenced within one year after discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); 15 U.S.C. § 78i(e). The First Circuit in *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 127–128 (1st Cir.1987), described in general terms the parameters of the Rule's statute of limitations.

Plaintiff's federal claims, premised on violations of the Securities Exchange Act and Rule 10b–5, are governed by the Massachusetts statute of limitations for certain personal tort actions, Mass. Gen.L. ch. 260, § 2A. *See supra,* p. 124 & note 2; *General Builders Supply Co. v. River Hill Coal Venture,* 796 F.2d 8, 11 n. 3 (1st Cir.1986). Federal common law, however, determines when the stat-

ute begins to run for such claims and when the statute is tolled. *Cook [v. Avien, Inc],* 573 F.2d [685, 694 (1st Cir. 1978) ].  As we said in *Cook:*

> Under federal law, the doctrine of fraudulent concealment operates to toll the statute of limitations "where the party injured by the fraud remains in ignorance of it *without any fault or want of diligence or care on his part* ... until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1874) (footnote omitted). ... Even without affirmative acts on the part of defendants, then, a federal cause of action will accrue at the time when plaintiff *in the exercise of reasonable diligence* discovered or should have discovered the fraud of which he complains.

*Id.* at 694–95 (emphasis supplied).  In other words, "storm warnings" of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner, *Cook,* 573 F.2d at 697, and his cause of action is deemed to accrue on the date when he *should have discovered* the alleged fraud. *General Builders Supply,* 796 F.2d at 11.  We have recently emphasized, moreover, that whether a plaintiff should have discovered the fraud "is an objective question" requiring the court to "determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud." *Id.* at 11 (citing *Hupp v. Gray,* 500 F.2d 993, 997 (7th Cir.1974)).

### The Arguments

■ Defendants maintain that Cape Ann's original Complaint, filed on August 1, 2000, is untimely on its face because the pleadings confirm that Cape Ann knew or should have known of defendants' fraudulent conduct prior to August 1, 1999.  Defendants point to the fact that on November 28, 1997, Deloitte provided NutraMax's Audit Committee with a "storm warnings" audit letter questioning the company's inventory practices, expense accounting, and inadequate reserves.  Defendants further argue that NutraMax's knowledge in this regard is imputable to Cape Ann as a Director and Audit Committee member. Even if the import of Deloitte's November 1997 audit letter had gone unremarked, defendants maintain that the 1998 audit letter, which underscored the same deficiencies, transformed the storm warnings into a full-blown gale.

The Trust maintains that Deloitte's 1997 and 1998 audit letters, read in the light most favorable to Cape Ann, are insufficient for the court to find as matter of law that Cape Ann was on inquiry notice of defendants' fraud.  What the Trust seems to be saying is that these tocsin soundings amounted to nothing more than accountants' hyperbole and would have been treated as such by any reasonable corporate director.  Moreover, according to the Trust, there is a factual issue whether Cape Ann, even if placed on inquiry notice, nonetheless acted diligently in investigating the possibility of fraud on the Officers' part.

Defendants reply that if the allegations of the Amended Complaint fail to establish that Cape Ann was placed on inquiry notice by the 1997 and 1998 Deloitte letters, they conclusively demonstrate that by August 1, 1999, Cape Ann had actual knowledge of the fraud.  Defendants point to two passages in the Amended Complaint in this regard.  In Paragraph 5, Cape Ann alleges that:

in mid–1999, new management at Nutra-Max discovered the pervasive fraud that the Officer Defendants had perpetrated under the cover of Deloitte's egregiously deficient audits. The Company learned that the Officer Defendants' inflation of the Company's earning and assets—which Deloitte had knowingly and reck-lessly ignored—had accumulated over time to more than a $60 million over-statement of NutraMax's assets and net worth.

Similarly, in Paragraph 107, Cape Ann al-leges that:

> The full extent of Deloitte's intentional misrepresentations—and of the miscon-duct of the Officer Defendants—came to light during 1999, when the Board of Directors hired a new Chief Operating Officer. Immediately upon his arrival, he noted the extreme inadequacy of [the Company's accounting software], the Company's accounting procedures, and the Company's internal controls. He also began to suspect that there might be irregularities in the Company's books and records. On his recommendation, the Board of Directors retained counsel to conduct an investigation.

The Trust responds that the terms "mid 1999" and "during 1999" are too vague to hold Cape Ann to a notice date of August 1, 1999. This argument, however, is con-tradicted by a statement made by the Trust in its Opposition to Deloitte's mo-tion. The Trust, in Footnote 8 of its brief, states that:

> [Deloitte] alleges that it lost its engage-ment as NutraMax's auditor because of a disagreement with NutraMax's man-agement regarding an accounting issue. Mem. 1. Although not germane to this motion to dismiss, NutraMax was in the process of discovering Deloitte's malfea-sance at the same time an accounting disagreement arose between Deloitte and NutraMax.

Trust's Memorandum, p. 10. Defendants argue that because the Amended Com-plaint alleges that the Board decided to replace Deloitte in January of 1999, and Deloitte in fact resigned on May 18, 1999, this footnote establishes that Cape Ann knew or should have known in May of 1999 that NutraMax's management was deeply enmeshed in financial wrongdoing.

*Ruling*

If the defendants' argument was prem-ised solely on whether plaintiffs were on inquiry notice as of "1999" or "mid–1999," or if plaintiffs stood in the shoes of arms-length shareholders of NutraMax, I would be inclined to agree that issues of fact as to the force of the storm warnings and the plaintiffs' due diligence would preclude en-try of judgment. But Cape Ann was no ordinary shareholder. It held a seat on NutraMax's Board of Directors and served on the company's Audit Committee. The duty of a director to act diligently to pro-tect corporate and shareholder interests against fraud or mismanagement on the part of a corporation's officers is well-established. *See Hathaway v. Huntley,* 284 Mass. 587, 592, 188 N.E. 616 (1933). It is inconceivable that a reasonable di-rector of NutraMax, with privileged access to the company's books and records, upon receiving Deloitte's November 1997 letter warning of serious financial impropriety, would not have recognized the need for an immediate investigation. The issue is not whether the alarms sounded in the De-loitte letter were accountant's doublespeak (as plaintiffs contend), which they were not. The point is that had Cape Ann done what its fiduciary duty required it do, it would have discovered the fraud, if not in 1997, certainly by 1998, when Deloitte sounded the third alarm.[8] The Amended

---

8. According to the Amended Complaint, De-loitte in November *and* December of 1997,

Complaint admits as much by detailing the ease and alacrity with which NutraMax's new Chief Operating Officer, acting upon the same accounting concerns voiced earlier by Deloitte, succeeded in unearthing the fraud. Consequently, the motions to dismiss the Cape Ann securities law claims of the Amended Complaint will be *ALLOWED* as plainly barred by the Rule 10b–5 statute of limitations.

### The New Plaintiffs' Filing Date

Because the previous ruling relies on the fact that Cape Ann's duty to investigate its securities claims arose by virtue of its position as a Director and member of NutraMax's Audit Committee, the securities claims of the non-Cape Ann plaintiffs, who were for the most part distant shareholders in the company, are not vulnerable on similar grounds (as defendants acknowledge). Defendants, however, argue that the statute of limitations began to run for the non-Cape Ann plaintiffs, at the very latest, on November 12, 1999, the date on which Deloitte withdrew its audit reports for 1996, 1997, and 1998.

The Trust argues the new plaintiffs' claims are timely because under Fed. R.Civ.P. 15(c)(3), their claims relate back to Cape Ann's filing date of August 1, 2000. Defendants respond that Rule 15(c)(3) provides that the claims of subsequently added plaintiffs relate back to the

date of an original complaint only in instances of clerical misnomer or where a claim is properly assigned to a successor by a timely plaintiff.[9]

The Trust argues that *Allied International, Inc. v. International Longshoremen's Ass'n, AFL–CIO*, 814 F.2d 32, 35 (1st Cir.1987), sets out the appropriate test under Fed. R. Civ. P 15(c), and that the inclusion of the new plaintiffs in the Amended Complaint satisfies that test. As the Court stated in *Allied International:*

> when revision of a complaint has the effect of substituting a fresh plaintiff for the original one, three requirements must be met if the former's claim is different and is to relate back: the amended complaint must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; there must be a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them; and undue prejudice must be absent.

*Id.,* at 35–36. While the Trust is correct that the first prong of the *Allied International* test is satisfied, that is, the claims of the new plaintiffs clearly arise out of the

---

warned NutraMax of accounting irregularities.

**9.** Fed R. Civ. P. 15(c)(3) provides that an amendment relates back to an earlier filed pleading when:

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

same conduct or occurrence (systemic financial fraud), the real issue is whether the new plaintiffs satisfy the identity of interest prong of the test. More precisely, does the assignment of a claim by an untimely party to a nominee whose Complaint arguably is timely (or would have been so had it asserted the claim of the untimely plaintiff at the time of the original filing) create a sufficient identity of interest between the assignor and the nominee as to permit relation back under Rule 15(c)? [10]

Defendants argue that *Ebrahimi v. E.F. Hutton & Co., Inc.*, 794 P.2d 1015, 1018 (Colo.Ct.App.1989), provides definitive guidance. In that case, Farhad Ebrahimi, his wife, mother, and brother owned several brokerage accounts at E.F. Hutton. A friend of Ebrahimi also owned an account at E.F. Hutton. After Ebrahimi filed a Complaint alleging negligent misrepresentation and breach of fiduciary duty on the part of E.F. Hutton, the friend assigned similar claims regarding his own E.F. Hutton account to Ebrahimi, who then attempted to amend the Complaint. The Colorado Court of Appeals upheld the trial court's ruling barring the amendment as untimely.

We likewise find no merit in plaintiffs' assertion that the trial court erred in instructing that the statute of limitations barred the friend's claim for breach of fiduciary duty unless the jury found that the statute had been tolled by fraudulent concealment on the part of Hutton. They argue that, because Farhad was the assignee of the friend's claim, the amendment to the original complaint, which was made to add this claim, related back to the date that that original complaint was filed. They maintain further that, since this amendment did not have the effect of adding a party (as would have been the case had the friend asserted the claim in his own behalf), it was not necessary to meet those requirements for relation back that C.R.C.P. 15(c) imposes when a new party is joined in the litigation. We disagree. [11]

C.R.C.P. 15(c) provides, generally, that a pleading amendment, if it arises out of the conduct, transaction, or occurrence that was the subject of the original pleading, shall relate back to the date of that original pleading. However, if such an amendment adds a party against whom a claim is asserted, the claim against that new party relates back only if that party was previously aware of the assertion of the claim, and the original failure to join that party was caused by a mistake as to the identity of the proper party to be joined. See *May Department Stores Co. v. University Hills, Inc.*, 789 P.2d 434 (Colo.App. 1989); *Shepherd v. Wilhelm*, 41 Colo. App. 403, 591 P.2d 1039 (1978).

While C.R.C.P. 15(c) does not expressly refer to an amendment that adds a party plaintiff, it has been said that such an amendment must also meet this rule's criteria in order for it to relate

---

10. "Identity of interest generally means that the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 1499. Although framed in terms of newly added defendants, the commentary on the Rule makes clear that the "identity of interest" test applies to newly

added plaintiffs as well. Amendments substituting new plaintiffs are liberally allowed where the new plaintiff is the real party in interest, or where because of a mistake as to capacity the wrong party-plaintiff was named. *Id.*, § 1501.

11. The Colorado rule tracks the language of the Federal Rule.

back to an earlier pleading. *See generally* 3 Moore's Federal Practice § 15:15 [4.–2] at 15–169, et seq. (1989). *See also Higgins, Inc. v.. Kiekhaefer Corp.*, 246 F.Supp. 610 (E.D.Wis.1965) (holders of patents similar to plaintiff's not permitted to be joined as additional plaintiffs after statute of limitations had run). It is only if the addition or change in the identity of the plaintiff constitutes a mere change in the plaintiff's capacity or status, or if it consists of the substitution of a real party in interest to a previously asserted claim, that such an amendment may be deemed to relate back for limitation purposes. *See Allied International, Inc. v. International Longshoremen's Ass'n*, 814 F.2d 32 (1st Cir.1987).

Here, the claim asserted in the amendment was a wholly separate claim in which Farhad had no beneficial interest, except as a later assignee. In our view, the effectiveness of a statute of limitations cannot be destroyed merely by assigning a claim to a present litigant, rather than adding the beneficial claimant as a new party. Thus, the pleading amendment that added this claim did not relate back to the time of the initial complaint, and the court committed no error in its instructions upon the effect of the statute of limitations. *Ebrahimi*, 794 P.2d at 1018.

The reasoning of *Ebrahimi* is persuasive with respect to the non-Cape Ann plaintiffs. As in *Ebrahimi*, the fact that the Trust is the assignee of their claims is not dispositive. While Rule 15(c) permits the relation back of added plaintiffs as well as defendants, considerations of notice and the avoidance of undue prejudice impose an identity of interest test as stringent as that applied when a new defendant is

sought to be added to the Complaint. *Allied International* provides a good example. No prejudice was found where the subsequently added plaintiff had purchased all of the assets of the predecessor plaintiff and had continued the identical business with the full knowledge of the defendant. 814 F.2d at 36. *Compare In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1098 (N.D.Cal.1994), *aff'd*, 95 F.3d 922 (9th Cir.1996) (second class of untimely Rule 10b–5 plaintiffs could not show an identity of interest with the original class of timely plaintiffs).[12] Here the claims of the non-Cape Ann plaintiffs are no more related to Cape Ann's interests than were those of the friend in *Ebrahimi* or the late-filing class of plaintiffs in *Syntex*. To allow relation back of the claims of the late-filing plaintiffs here would emasculate the statute of limitations. Under the principle advocated by the Trust, any timely plaintiff could become a place holder for all late-filing plaintiffs simply by acting as a repository for the assignment of their late-blooming claims. While this is not to imply that the Trust was established with this purpose in mind, to permit it now to be so used would be an abuse of Rule 15(c).

### ORDER

For the foregoing reasons, the motions to dismiss are *ALLOWED* as to the federal securities claims. The associated state law claims will be remanded to the Superior Court for resolution.[13]

SO ORDERED.

---

**12.** Indeed, one wonders whether there is even an identity of interest among the three loosely defined classes of plaintiff the Trust is seeking to add to the litigation.

**13.** *See Camelio v. American Federation*, 137 F.3d 666, 672 (1st Cir.1998) ("[T]the balance

of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation'').