# United States Court of Appeals
## For the First Circuit

No. 01-2622

JAMES R. YOUNG, AS TRUSTEE OF THE NUTRAMAX LITIGATION TRUST,
Plaintiff, Appellant,

v.

DONALD E. LEPONE ET AL.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Greenberg,* Senior Circuit Judge.

David C. Frederick, with whom Mark C. Hansen, Silvija A. Strikis, Leo R. Tsao, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Robert M. Thomas, Jr., and Thomas & Associates were on brief, for appellant.
Thomas J. Dougherty, with whom David S. Clancy, Kara E. Fay, and Skadden, Arps, Slate, Meagher & Flom LLP were on brief, for appellee Deloitte & Touche LLP.

September 10, 2002

_____
*Of the Third Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  We confront here two intricate variations on a standard theme — the invocation of a limitations defense to federal securities claims.  The general scenario is distressingly familiar:  shareholders of a publicly-held company allege that the corporate officers systematically inflated earnings, concealed losses, and treated the company's books as works of fiction.  The shareholders further allege that their natural guardians — the company's outside accountants — perpetuated this massive fraud through perfunctory audits and certified financial statements that they knew (or consciously avoided knowing) were materially false and misleading.

The district court ruled that all the federal securities claims were barred by the applicable one-year statute of limitations.  See Cape Ann Investors, LLC v. Lepone, 171 F. Supp. 2d 22 (D. Mass. 2001).  We conclude that this ruling is partially correct and partially incorrect.  As to the federal securities claim asserted by the original plaintiff, the primary issue is whether management letters from the accounting firm effectively placed this plaintiff (an investor who held a seat on the company's board of directors and the audit committee) on inquiry notice of possible fraud.  Given our inability to resolve that highly nuanced issue based solely on the face of the amended complaint, we vacate the lower court's order of dismissal in pertinent part and remand for further proceedings.  As to the later-filed claims asserted by

-2-

the remaining shareholders, we reach a different result. Because those plaintiffs (and their claims) lacked a sufficient identity of interest with the original complainant (and its claims), Federal Rule of Civil Procedure 15(c)(3) does not apply; the claims are not entitled to relate back to the date when the suit was first filed; and, accordingly, the claims are time-barred. We therefore affirm that portion of the district court's ukase.

## I. BACKGROUND

We glean the facts from the amended complaint, stripped of any rhetorical gloss. Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). We then trace the travel of the case and offer a roadmap for our exploration of the instant appeal.

### A. The Facts.

At the times relevant hereto, NutraMax Products, Inc. ("NutraMax" or "the company") was a Delaware corporation that maintained its principal offices in Gloucester, Massachusetts. The company's shares were traded on the NASDAQ stock exchange. Donald E. Lepone served as its chief executive officer, Robert F. Burns as its chief financial officer, and Noreen Gottfredsen as its controller.

NutraMax's fiscal year ran from October 1 through September 30. Like all publicly-held corporations, it issued annual financial statements within ninety days after the close of each fiscal year. For each of the years here in question – 1996,

1997, and 1998 – it represented that these financial statements were prepared in accordance with generally accepted accounting principles ("GAAP").[1] The company's independent auditor, Deloitte & Touche LLP ("Deloitte"), placed its imprimatur on each of these financial statements. In so doing, Deloitte expressly certified that: (1) it had conducted its audit in accordance with generally accepted auditing standards ("GAAS");[2] (2) NutraMax's financial statements had been prepared in accordance with GAAP and fairly presented the company's financial position and operational results in all material respects; and (3) Deloitte could provide reasonable assurances, based on its audits, that the financial statements contained no material misrepresentations.

In connection with its presentation of audited financial statements, Deloitte wrote an annual "management letter" to the audit committee designated by NutraMax's board of directors. Those letters contained comments that Deloitte deemed pertinent to management's assessment of the financial condition of the company

---

[1] The GAAP rules embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time. See Sanders v. Jackson, 209 F.3d 998, 1001 n.3 (7th Cir. 2000) (citing American Institute of Certified Public Accountants, Statement of Auditing Standards No. 69, ¶ 69.02 (1992)).

[2] The GAAS compilation consists of general criteria relating to the inquiry undertaken, and the judgments exercised, by the auditor in the performance of its examination and the issuance of its report. In Deloitte's own words, these standards "require that [the auditor] plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement."

and the reliability of its accounting systems. In the management letter submitted under date of November 28, 1997, Deloitte concluded that certain deficiencies in the company's internal control structure constituted "reportable conditions."[3] Specifically, that letter highlighted a number of weaknesses in NutraMax's inventory control and valuation procedures, identified a $291,000 variance in an inventory account, pointed out under-accruals of various expenses, and noted that the company had failed to earmark adequate reserves for bad debts. Deloitte nonetheless certified the 1997 financial statements without any substantial qualification. Much the same pas de deux occurred the following year. On November 24, 1998, Deloitte wrote to NutraMax's audit committee identifying reportable conditions involving inventory control and valuation, but proceeded to certify the company's financial statements for fiscal 1998 without substantial

---

[3]A reportable condition is generally regarded as a weakness in the design or operation of the internal control structure that, in the auditor's judgment, reflects a significant shortcoming that "could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements." Monroe v. Hughes, 31 F.3d 772, 774 (9th Cir. 1994) (quoting American Institute of Certified Professional Accountants, Professional Standards (CCH), AU § 325.02). This squares with Deloitte's 1997 and 1998 management letters, each of which states that "[r]eportable conditions involve matters coming to our attention relating to significant deficiencies in the design or operation of the internal control structure that, in our judgment, could adversely affect the Company's ability to record, process, summarize, and report financial data consistent with the assertions of management in the consolidated financial statements."

qualification. On both occasions, Deloitte's representatives assured the audit committee that the reportable conditions did not denote material weaknesses in NutraMax's reporting systems (and, therefore, did not pose a significant risk of skewing the company's financial statements). Moreover, Deloitte assured the audit committee that, "as required by GAAS," its audit for each of these years "would provide reasonable assurance of detecting irregularities or illegal acts by NutraMax management and employees."

In 1999, NutraMax's board of directors installed a new chief operating officer ("COO"). It did not take him long to note glaring inadequacies in the company's accounting procedures and internal controls. Suspecting that the books and records contained serious irregularities, the COO recommended that the board engage outside counsel to conduct a full investigation into the company's accounting records, systems, and procedures. The board complied, and the law firm designated by the board engaged a team of forensic accountants. In the spring or summer of 1999 – the amended complaint is vague as to the exact timing – the investigators concluded that NutraMax's management had failed to write down worthless inventory, improperly accrued expenses, booked bogus journal entries, and incorrectly adjusted the accrual dates on various receivables. As a result, a myriad of accounts required multimillion dollar adjustments.

The denouement occurred on August 18, 1999, when NutraMax publicly announced that it had (1) ousted Lepone and Burns, (2) delayed the release of an earnings report for the third quarter, and (3) decided that it would be necessary to restate its financials for certain previous years. In the wake of this announcement, the price of NutraMax's common stock plummeted. NutraMax subsequently wrote down its assets by over $75,000,000 and restated its net worth from a positive figure of $21,200,000 to a negative figure of $46,600,000. On October 15, 1999, NASDAQ delisted the company. On November 12, 1999, Deloitte withdrew its audit reports for the 1996, 1997, and 1998 fiscal years.[4] Less than six months later, NutraMax filed for bankruptcy protection under Chapter 11. See 11 U.S.C. §§ 1101-1174.

## B. **The Proceedings Below**.

On August 1, 2000, Cape Ann Investors, LLC ("Cape Ann"), a major NutraMax shareholder, sued Lepone, Burns, Gottfredsen, and Deloitte in the United States District Court for the District of Massachusetts. Cape Ann's complaint charged that the three former officers had systematically falsified NutraMax's financial statements by inflating earnings, refusing to write off outdated inventory, and manipulating the company's accounting records to misrepresent its financial performance and condition. The

---

[4]Although the amended complaint is inexplicit as to the date when NutraMax and Deloitte parted company, it is apparent that the separation occurred prior to this date.

complaint further charged that Deloitte had facilitated the former officers' fraudulent misconduct by conducting perfunctory audits of the company's finances — audits that fell far short of GAAS. Cape Ann alleged that the defendants' malfeasance violated both federal securities law, see Securities Exchange Act of 1934, 15 U.S.C. § 78j; SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and state law.

At this point, we shift our focus momentarily to NutraMax's Chapter 11 reorganization. In the course of that proceeding — which is pending in Delaware — the bankruptcy court established the NutraMax Litigation Trust ("the Trust"). The Trust became the assignee of several sets of claims. Only one such set is of interest here: all claims by persons who held NutraMax common stock prior to the bankruptcy filing and who either voted to approve the reorganization plan or elected thereafter to assign their claims to the Trust. By voting in favor of the reorganization plan, Cape Ann became a participant in the Trust. Since Cape Ann's position is distinct from that of the other shareholders who have assigned their rights to the Trust, we emulate the district court, see Cape Ann, 171 F. Supp. 2d at 23-24, and refer to Cape Ann by name while referring to the other electing shareholders as the "new plaintiffs."

On March 9, 2001, the Trust filed an amended complaint that, inter alia, sought to substitute the Trust for Cape Ann as the named plaintiff in the securities fraud action and to add

claims assigned to it by the new plaintiffs.[5] Deloitte moved to dismiss the amended complaint, asserting, inter alia, that the federal securities claims were time-barred by the applicable one-year statute of limitations. Following briefing and oral argument, the district court granted the motion. Id. at 27-28.

The district court's decision sets the stage for our discussion of the issues on appeal. To begin with, the court recognized that Cape Ann's claims and the new plaintiffs' claims had to be analyzed differently. Turning first to Cape Ann, the court emphasized that, unlike an ordinary investor, it had a presence on the company's board of directors and audit committee during 1997 and 1998. On this basis, the court concluded that a reasonable director in Cape Ann's shoes (i.e., a director who had received Deloitte's 1997 and 1998 management letters) would have realized the need for an immediate investigation "if not in 1997, certainly by 1998." Id. at 27. Based on this conclusion, the court ruled that Cape Ann (which had not brought suit until August 1, 2000) had missed the one-year statute of limitations vis-à-vis its federal securities claim. Id. at 28.

Turning to the federal securities claims brought by the new plaintiffs, the district court rejected the Trust's argument

---

[5]These included various state-law claims that have no bearing on this appeal. We refrain from any discussion of those claims. We likewise refrain from any mention of other persons (e.g., creditors) who assigned claims to the Trust.

that those claims related back to the date on which Cape Ann had filed the original complaint. Id. at 28-30. Apparently concluding that the limitations period for the new plaintiffs began to run no later than November 12, 1999 (the date on which Deloitte withdrew its audit reports), the court determined that these claims, first asserted on March 9, 2001, had emerged too late. Id. at 30. Having found all the federal claims time-barred, the court declined to exercise supplemental jurisdiction over the remaining state-law claims, see supra note 5, and dismissed those claims without prejudice to their renewal in an appropriate forum. This timely appeal ensued.

## C. **The Anatomy of the Appeal**.

Although this appeal originally encompassed all the federal securities claims, the former officers recently bought their peace, and we approved a stipulation dismissing the case as to them. See Fed. R. App. P. 42(b). Consequently, the appeal proceeds only with respect to the remaining defendant (Deloitte).

In the pages that follow, we examine whether the district court erred in assessing the timeliness of the plaintiffs' federal securities claims against Deloitte. Because the district court dismissed the claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, we afford plenary review, giving credence to all well-pleaded factual averments limned in the amended complaint and indulging all reasonable inferences therefrom in the

plaintiffs' favor.  Aulson, 83 F.3d at 3.  "If the facts contained in the complaint, viewed in this favorable light, justify recovery under any applicable legal theory, we must set aside the order of dismissal."  SEC v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001).  Where, as here, an order of dismissal is predicated on the statute of limitations, we will affirm only if "the pleader's allegations leave no doubt that an asserted claim is time-barred."  LaChappelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998).

## II.  THE LEGAL LANDSCAPE

Rule 10b-5 claims "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation."  Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).  In this case, Deloitte concedes that suit was brought within three years of the alleged violation.  Our focus, then, is on the date of discovery.

With respect to a Rule 10b-5 violation that involves fraudulent concealment, the one-year interval does not begin to run "until the time when the plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains."  Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 129 F.3d 222, 224 (1st Cir. 1997) (citations and internal quotation marks omitted).  This formulation is not self-executing, and the circumstances of each case must be explored

-11-

independently. When telltale warning signs augur that fraud is afoot, however, such signs, if sufficiently portentous, may as a matter of law be deemed to alert a reasonable investor to the possibility of fraudulent conduct. See Mathews v. Kidder, Peabody & Co., 260 F.3d 239, 251 n.15 (3d Cir. 2001) (collecting cases).

We have dubbed such signs "storm warnings," and have established a two-part process for handling a defendant's claim that such precursors should have sufficed to put investors on inquiry notice. Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 128 (1st Cir. 1987). The first step in the pavane requires a reviewing court to ascertain whether, when, and to what extent, storm warnings actually existed in a given situation. Because sufficient storm warnings would lead a reasonable investor to check carefully into the possibility of fraud, this step necessarily entails a determination as to whether a harbinger, or series of harbingers, should have alerted a similarly situated investor that fraud was in the wind. Id. The next step requires the court to assay whether, once sufficient storm warnings were apparent, the investor probed the matter in a reasonably diligent manner. Id. This issue lends itself to a more individualized inquiry — an inquiry that focuses on the particulars of each investor's situation. See id.

When the defendant in a securities fraud case pleads the statute of limitations as an affirmative defense, the plaintiff

normally has the burden of pleading and proving facts demonstrating the timeliness of her action. See Gen. Builders Supply Co. v. River Hill Coal Venture, 796 F.2d 8, 11-12 (1st Cir. 1986); Cook v. Avien, 573 F.2d 685, 695 (1st Cir. 1978). If, however, a defendant seeks to truncate the limitations period by claiming that the plaintiff had advance notice of the fraud through the incidence of storm warnings, then the defendant bears the initial burden of establishing the existence of such warnings. Mathews, 260 F.3d at 252. Only if the defendant succeeds in this endeavor must the plaintiff counter with a showing that she fulfilled her corresponding duty of making a reasonably diligent inquiry into the possibility of fraudulent activity. Maggio, 824 F.2d at 128.

As this discussion makes plain, the existence vel non of storm warnings has important ramifications for determining when the statute of limitations in a Rule 10b-5 case begins to run. The multifaceted question of whether storm warnings were apparent involves issues of fact. Id. In the archetypical case, therefore, it is for the factfinder to determine whether a particular collection of data was sufficiently aposematic to place an investor on inquiry notice. Marks v. CDW Computer Ctrs., Inc., 122 F.3d 363, 368-69 (7th Cir. 1997); see also Gen. Builders, 796 F.2d at 12 (emphasizing that this sort of factual question may be determined as a matter of law only when the underlying facts are either admitted or undisputed). So too the related question of whether a

-13-

particular plaintiff exercised reasonable diligence in the face of such warnings.  Maggio, 824 F.2d at 128; Kennedy v. Josephthal & Co., 814 F.2d 798, 803 (1st Cir. 1987).

There is one lingering question.  In Cooperativa, we left open the question of whether the statute of limitations begins to accrue on the date that sufficient storm warnings first appear or the later date on which an investor, alerted by storm warnings and thereafter exercising reasonable diligence, would have discovered the fraud.  129 F.3d at 225.  In the case at hand, this difference is potentially meaningful.  We turn, then, to that question.

A number of considerations drive us to choose the latter answer.  First, we believe that the purpose of the discovery rule is to afford a suitable degree of protection to plaintiffs who have exercised reasonable diligence consistent with the information available to them.  Depending on the individual circumstances, a reasonably diligent investigation following the receipt of storm warnings may consume as little as a few days or as much as a few years to get to the bottom of the matter.  Given the wide range of possibilities, we think it is fair that the one-year limitations period begin to accrue only at the point when the Rule 10b-5 violation reasonably could have been discovered.

Second, and perhaps more importantly, we look to the principles underlying the one-year limitations period.  As the Tenth Circuit noted in Sterlin v. Biomune Sys., Inc., 154 F.3d

1191, 1202 (10th Cir. 1998), the proper administration of a discovery rule must strike a delicate balance between the staunch federal interest in requiring plaintiffs to bring suit promptly once they have been apprised of their claims (thus securing repose for deserving defendants) and the equally strong interest in not driving plaintiffs to bring suit prematurely, that is, before they are able, in the exercise of reasonable diligence, to discover the facts necessary to support their claims. It makes no more sense to reconcile this balance in a way that causes the one-year limitations period to begin to run before a reasonably diligent investor has had an adequate opportunity to discover the facts underlying the alleged fraud than it would to reconcile it in a way that allows an investor to dawdle endlessly after sufficient storm warnings are apparent. In the end, a limitations period that begins when a plaintiff reasonably should have discovered the fraud treats both plaintiffs and defendants even-handedly.

This interpretation of the limitations standard has metamorphosed into the majority view. See, e.g., Rothman v. Gregor, 220 F.3d 81, 97-98 (2d Cir. 2000); Morton's Mkt. Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 836 (11th Cir. 1999); Sterlin, 154 F.3d at 1201; Marks, 122 F.3d at 368; Byelick v. Vivadelli, 79 F. Supp. 2d 610, 619 (E.D. Va. 1999); see also Berry v. Valence Tech., Inc., 175 F.3d 699, 704 (9th Cir. 1999) (predicting that the Ninth Circuit, were it to adopt the inquiry

notice rule, would subscribe to the <u>Sterlin</u> court's approach).[6]
This consensus has become particularly evident since <u>Lampf</u>.  In
etching the bounds of the one-year limitations period, the <u>Lampf</u>
Court explained that equitable tolling is both "unnecessary" and
"fundamentally inconsistent" with the one-year limit because this
period, "by its terms, begins after discovery of the facts
constituting the violation."  501 U.S. at 363.  From this, we can
extrapolate a standard that starts the limitations clock only when
a plaintiff, in the exercise of reasonable diligence, should have
discovered her cause of action.  <u>Accord</u> <u>Sterlin</u>, 154 F.3d at 1202.
We hold, therefore, that following the receipt of sufficient storm
warnings, a plaintiff's cause of action is deemed to accrue on the
date when, exercising reasonable diligence, she would have
unearthed the fraud.

## III.  THE ORIGINAL CLAIM

We now determine where Cape Ann's federal securities
claim falls in this taxonomy.  The critical date is August 1, 1999
— one year before Cape Ann brought suit.  The question, then, is

---

[6]Even though we declined in <u>Cooperativa</u> to discrepate between
the date that storm warnings first appeared and the date that a
reasonably diligent investor would have discovered the fraud, 129
F.3d at 225, we wrote in <u>Maggio</u> that "storm warnings of the
possibility of fraud trigger a plaintiff's duty to investigate in
a reasonably diligent manner . . . and his cause of action is
deemed to accrue on the date when he <u>should have discovered</u> the
alleged fraud."  824 F.2d at 128 (emphasis in original; citation
and internal quotation marks omitted).  That dictum correctly
anticipated the rule that we adopt today.

whether it can be said, as a matter of law, that Cape Ann should have discovered the fraud before that date.

The district court apparently concluded — we say "apparently" because the court's opinion is not explicit on this point — that the sequential 1997 and 1998 management letters amounted to sufficient storm warnings, and, therefore, put Cape Ann on inquiry notice of the alleged fraud no later than November of 1998. Cape Ann, 171 F. Supp. 2d at 27-28. Noting that the management letters were directed to the audit committee of the NutraMax board, and that a Cape Ann representative held a seat on that committee, the court reasoned that those letters should have led Cape Ann, as a fiduciary of NutraMax, to recognize the need for an immediate investigation (which, the court surmised, would have uncovered the fraudulent scheme). Id. We test this hypothesis.

Distilled to bare essence, Deloitte can prevail at this procedural stage only if the trial court properly concluded that the management letters amounted to storm warnings for a shareholder who (like Cape Ann) held a seat on the company's board of directors and audit committee; that Cape Ann failed to exercise reasonable diligence in the face of those portents; and that, had Cape Ann investigated, it would have discovered the fraud prior to August 1, 1999.

The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four

-17-

corners of the plaintiff's complaint. Here, however, the management letters were neither attached to the amended complaint nor incorporated by reference therein. We nonetheless conclude that it was proper for the trial court to consider those letters in ruling on Deloitte's motion to dismiss.

The key fact is that the amended complaint contained extensive excerpts from, and references to, these letters. When the factual allegations of a complaint revolve around a document whose authenticity is unchallenged, "that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998); see also 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.34[2] (3d ed. 1997) (explaining that courts may consider "[u]ndisputed documents alleged or referenced in the complaint" in deciding a motion to dismiss). Both sides agree that this principle is controlling here.

The significance of this ruling is readily apparent. It is undisputed that Cape Ann held a seat on NutraMax's audit committee, and that Deloitte addressed the management letters to that committee. On that basis, the district court correctly assumed, for the purposes of its Rule 12(b)(6) analysis, that Cape Ann knew or should have known about this correspondence. It follows logically that the substance of those missives may be

incorporated into the objective prong of the <u>Maggio</u> test. <u>Cf.</u>
<u>Constructora Maza, Inc.</u> v. <u>Banco de Ponce</u>, 616 F.2d 573, 578-79
(1st Cir. 1980) (incorporating facts known to or ascertainable by
creditor into resolution of objective "prudent business person"
standard). This leaves us with the following legal question:
Would Deloitte's management letters necessarily have placed a
reasonable investor on inquiry notice concerning the possibility of
fraud?

For present purposes, the import of the management
letters lies in the reportable conditions identified therein, but
those references cannot be considered in a vacuum. There are
countervailing considerations here. In the first place, the
letters themselves contained specific reassurances that the
reportable conditions did not represent material weaknesses in the
company's reporting systems. In the second place, Deloitte gave
NutraMax a clean bill of financial health notwithstanding the
contents of the management letters: it certified NutraMax's 1997
and 1998 consolidated financial statements without any significant
qualification. And, finally, the amended complaint alleges that
Deloitte provided Cape Ann with independent assurances that tended
to palliate the import of the reportable conditions. For example,
the amended complaint alleges that Deloitte offered reassurances
that it had adjusted each of its audits "to respond to the risks"
posed by the problems it had discovered in NutraMax's internal

-19-

controls. Moreover, Deloitte represented that, in addition to providing reasonable assurances of detecting irregularities and illegal acts, its audits had "focus[ed] on areas that were material to NutraMax's consolidated financial statements, even if those areas were not considered to be high risk." The complaint further alleges that after Deloitte issued its 1998 management letter, Cape Ann's representative asked Deloitte point-blank whether the letter raised any cause for concern and was assured that it did not. Given this steady stream of comforting words, we are not persuaded that the management letters necessarily placed Cape Ann on inquiry notice of the possibility that fraud was afoot.

It is, of course, true that Cape Ann, qua fiduciary, received other unsettling information between November of 1998 and August of 1999 (e.g., the COO's discoveries and the board's decision to engage outside counsel and authorize a forensic audit). But on the present record, we are unable to say with the requisite level of certainty that the newly appointed COO had discovered the fraud and so advised the board by the end of July 1999 (even though the amended complaint acknowledges that the fraud had been uncovered by mid-1999). And, moreover, to the extent that these developments may have comprised storm warnings, they simultaneously put Cape Ann on notice that a thorough investigation was in progress. Cape Ann hardly can be faulted, as a matter of law, for awaiting the results of that investigation before jumping to the

-20-

conclusion that management was cooking the books.  Cf. Jarrett v. Kassel, 972 F.2d 1415, 1424-28 (6th Cir. 1992) (allowing plaintiffs benefit of reasonably diligent investigation conducted on behalf of another); Jensen v. Snellings, 841 F.2d 600, 608 (5th Cir. 1988) (suggesting that limitations period did not begin to accrue until plaintiffs received results of investigation).  In short, the complaint, on its face, permits the inference that NutraMax's board neither knew of nor fully appreciated the true state of NutraMax's finances, much less Deloitte's role in the situation, until after August 1, 1999.

We also reject the district court's conclusion that, as a matter of law, Cape Ann failed to exercise reasonable diligence. While the fact that an investor is a director and a member of the company's audit committee is plainly relevant to an evaluation of the investor's diligence, fiduciary status, in and of itself, is not dispositive of the reasonable diligence issue:

> While the existence of a fiduciary relationship is one factor which a court should consider in determining whether the plaintiff has exerted due diligence, a mere allegation that such a fiduciary relationship existed is not necessarily determinative. We must also consider other factors, including the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants.

Gen. Builders, 796 F.2d at 12; accord Rowe v. Marietta Corp., 955 F. Supp. 836, 842-43 (W.D. Tenn. 1997) (rejecting summary judgment predicated, in part, on plaintiff's status as a director and his

receipt of storm warnings in that capacity). We hold, therefore, that Cape Ann's status as a fiduciary does not justify an irresistible inference that it acted in willful disregard of a known risk. From the information contained in the amended complaint, it is a jury question as to whether Cape Ann acted with reasonable diligence.[7]

Drawing all reasonable inferences in Cape Ann's favor, we do not think that a court could conclude, on the bare bones of the amended complaint, either that the management letters amounted to storm warnings or that those communications inexorably placed Cape Ann on inquiry notice. By like token, it cannot be said, as a matter of law, that Cape Ann failed to exercise diligence commensurate with its knowledge. Given these conclusions, we must vacate the order of dismissal insofar as that order pertains to Cape Ann's Rule 10b-5 claim.[8] See, e.g., Rothman, 220 F.3d at 96-98; Marks, 122 F.3d at 368-69; Olcott v. Del. Flood Co., 76 F.3d 1538, 1549 (10th Cir. 1996). We fully appreciate that this is a

---

[7]We recognize that pretrial discovery, not yet conducted, may change the picture. Consequently, we express no opinion as to whether summary judgment may be in order on a better-developed record.

[8]In reaching a contrary conclusion, the district court relied heavily on Hathaway v. Huntley, 188 N.E. 616 (Mass. 1933). Hathaway, however, arose in a markedly different procedural posture: the case had been referred to a master, who made extensive factual findings. Id. at 617. The Hathaway court relied on those findings in concluding that the defendant-director had failed to exercise reasonable diligence. Id.

close case on the facts, but we review a Rule 12(b)(6) disposition de novo — and in this instance we do not think that the amended complaint itself offers a sufficient basis for dismissal.

We add two brief observations designed to assist the district court on remand. First, we note that Deloitte has questioned whether Cape Ann's federal securities claim should be dismissed on the ground that the allegations set forth in the amended complaint were insufficiently specific. The district court did not address this asseveration, and we take no view of it.

We also note that courts generally refer to the law of the state of incorporation, rather than the law of the forum state, to determine the duties of corporate directors. 1 William E. Knepper & Dan A. Bailey, Liability of Corporate Officers & Directors § 1-5, at 16 (6th ed. 1998). In light of this tenet, we encourage the district court to take a closer look at whether Delaware law, rather than Massachusetts law, should be applied to ascertain the scope of Cape Ann's fiduciary duty for purposes of a Maggio analysis. We leave open the possibility, however, that a formal choice-of-law ruling will prove unnecessary. See, e.g., Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1064-65 (1st Cir. 1991) (declining to make such a ruling when choice of law will not affect the outcome).

## IV.  THE ADDED CLAIMS

We turn next to the new plaintiffs' federal securities claims.  Although the viability of this set of claims also hinges on temporal considerations, our evaluation traverses a much different analytical path.

The new plaintiffs first asserted their claims in the amended complaint, filed March 9, 2001.  They did not argue in the district court that the one-year limitations period was still open on that date.[9]  By failing to advance such a theory below, they have forfeited the right to raise it on appeal.  See Teamsters Union Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not squarely raised in the lower court cannot be broached for the first time on appeal."); McCoy v. MIT, 950 F.2d 13, 22 (1st Cir. 1991) (similar).

This leaves the new plaintiffs with the argument that they urged below.  That argument depends upon Rule 15(c)(3) of the Civil Rules, which states in pertinent part:

---

[9]This hardly seems surprising.  The date of suit — March 9, 2001 — was more than one year after (1) NutraMax's blockbuster announcement of August 18, 1999 and the resultant 40% drop in the price of the company's stock, (2) NASDAQ's delisting of the company's shares, and (3) Deloitte's withdrawal of its audit reports.  It strains credulity to maintain either that these events, collectively, did not amount to sufficient storm warnings or that the fraud was not readily discoverable by March of 2000.

> An amendment of a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted if . . . the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed. R. Civ. P. 15(c)(3). The new plaintiffs take the position that, under this rule, their federal securities claims relate back to August 1, 2000 — the date on which Cape Ann filed its original complaint – and, thus, come within the one-year prescriptive period. We find this argument unpersuasive.

At the outset, we acknowledge that the new plaintiffs' argument is theoretically available. Although the text of Rule 15(c)(3) seems to contemplate changes in the identity of <u>defendants</u>, we have recognized that the rule can be applied to amendments that change the identity of plaintiffs. <u>See</u> <u>Allied Int'l, Inc.</u> v. <u>Int'l Longshoremen's Ass'n</u>, 814 F.2d 32, 35 (1st Cir. 1987) (discussing potential applicability of the rule to an amendment "substituting a fresh plaintiff for the original one"); <u>see</u> <u>also</u> Fed. R. Civ. P. advisory committee note (1966) (emphasizing that Rule 15(c)(3) "extends by analogy to amendments changing plaintiffs"). In theory, then, the benefits of Rule 15(c)(3) are within the reach of new plaintiffs.

-25-

In practice, however, relation back is far from automatic. Rule 15(c)(3) is not an open invitation to every plaintiff whose claim otherwise would be time-barred to salvage it by joining an earlier-filed action. Rather, the rule strikes a carefully calibrated balance. Properly construed, it allows some claims that otherwise might be dismissed on the basis of procedural technicalities to prosper while at the same time keeping the door closed to other claims that have been allowed to wither on the vine. See Nelson v. County of Allegheny, 60 F.3d 1010, 1014 (3d Cir. 1995); see also 3 Moore's Federal Practice, supra, ¶ 15.19[3][a]. To separate wheat from chaff, we have laid down three separate requirements applicable to plaintiffs who seek succor under Rule 15(c)(3):

> [T]he amended complaint must arise out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; there must be a sufficient identity of interest between the new plaintiff, the old plaintiff, and their respective claims so that the defendants can be said to have been given fair notice of the latecomer's claim against them; and undue prejudice must be absent.

Allied Int'l, 814 F.2d at 35-36.

We ordinarily review a trial court's decision to grant or deny motions under Rule 15(c)(3) for abuse of discretion. E.g., id. at 37. It is, however, settled beyond peradventure that an error of law constitutes an abuse of discretion. See United States v. Keene, 287 F.3d 229, 233 (1st Cir. 2002); In re Grand Jury

-26-

Subpoena, 138 F.3d 442, 444 (1st Cir. 1998). Here, the district court rejected the new plaintiffs' claim that they were eligible for "relation back" principally on the ground that they and their claims lacked a sufficient identity of interest with the original plaintiff and its claims. Cape Ann, 171 F. Supp. 2d at 30. This was a quintessentially legal determination, made on undisputed facts, and thus engenders de novo review.

The guideposts for evaluating whether two parties possess a sufficient identity of interest to permit relation back are not well-defined. As to defendants, identity of interest typically means that parties are "so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." Singletary v. Pa. Dep't of Corr., 266 F.3d 186, 197 (3d Cir. 2001) (citing 6A Charles A. Wright et al., Federal Practice and Procedure § 1499, at 146 (2d ed. 1990)). "The substitution of such parties after the applicable statute of limitations may have run is not significant when the change is merely formal and in no way alters the known facts and issues on which the action is based." Staren v. Am. Nat'l Bank & Trust Co., 529 F.2d 1257, 1263 (7th Cir. 1976). The identity of interest requirement reflects this line of thought; it "ensures that the old and new plaintiffs are sufficiently related so that the new plaintiff was in effect involved in [the proceedings] unofficially from an early stage."

-27-

Leachman v. Beech Aircraft Corp., 694 F.2d 1301, 1309 (D.C. Cir. 1982) (citation and internal quotation marks omitted).

That formulation is not readily transferrable to plaintiffs. Nevertheless, it suggests that when a new plaintiff attempts to enter a pending action under the aegis of Rule 15(c)(3), courts should require substantial structural and corporate overlap to ensure that the defendant is not called upon to defend against new facts and issues. This, then, should be the focal point of the identity of interest requirement vis-à-vis a new plaintiff.

The case law runs along these lines. See 3 Moore's Federal Practice, supra, ¶ 15.19[3][c] (collecting cases). Some concrete examples may prove helpful. Courts have found a sufficient identity of interest when the original and added plaintiffs are a parent corporation and a wholly-owned subsidiary. Hernandez Jimenez v. Calero Toledo, 604 F.2d 99, 103 (1st Cir. 1979). So too when they are "related corporations whose officers, directors, or shareholders are substantially identical and who have similar names or share office space, past and present forms of the same enterprise." Id. Similarly, in Raynor Bros. v. Am. Cyanimid Co., 695 F.2d 382, 384-85 (9th Cir. 1982), the court sanctioned the substitution of a family partnership for a family-owned corporate plaintiff upon a showing that each partner also was a major shareholder in the corporation. And in Staren, 529 F.2d at 1263,

the court permitted the substitution of a corporation in lieu of two individuals (the president of the corporation and his business associate) to head off a claim that the corporation, rather than the individuals, was the purchaser in a particular transaction.

These cases sound a common theme. To use an old-fashioned word, they require a fairly advanced degree of privity to ground the substitution or addition of new plaintiffs under Rule 15(c)(3). Our decision in Allied International fits such a mold. There, we allowed the substitution, under Rule 15(c)(3), of a corporation that had purchased all the assets of the original complainant (and, afterwards, continued to operate the acquired business). 814 F.2d at 35-38.

The case at hand presents a variation on this theme: the question is whether stockholders in a publicly-held corporation, not related to each other except by that status, share a sufficient identity of interest to meet the requirements of Rule 15(c)(3). We answer that question in the negative. Persons who are identified with each other only by their ownership of stock in the same publicly-traded corporation share some of the same rights, but that fact, standing alone, does not place them in the kind of proximity needed to invoke Rule 15(c)(3).

In so holding, we repudiate the conceit that an action filed by one plaintiff gives a defendant notice of the impending joinder of any or all similarly situated plaintiffs. Such a rule

would undermine applicable statutes of limitations and make a mockery of the promise of repose. We, like other courts, flatly reject the proposition that relation back is available merely because a new plaintiff's claims arise from the same transaction or occurrence as the original plaintiff's claims. See In re Syntex Corp. Sec. Litig., 95 F.3d 922, 935 (9th Cir. 1996) (disallowing relation back for newly proposed investor plaintiffs who bought stock at different values and after different disclosures and statements than original plaintiffs); Page v. Pension Ben. Guar. Corp., 130 F.R.D. 510, 513 (D.D.C. 1990) (similar). This means, then, that the happenstance that individuals have invested in the same publicly-traded stock, without more, cannot suffice to confer identity of interest.

It is readily apparent, then, that the new plaintiffs in this case are facing an uphill climb — and the raw facts make the slope even steeper. The new plaintiffs' underlying Rule 10b-5 claims differ from Cape Ann's in significant respects. The pleadings reveal that Cape Ann invested in NutraMax stock with the avowed intention of becoming a "strategic partner" in the ownership and management of a third company whose later acquisition Cape Ann funded. Pursuant to this transaction and a subsequent private placement, Cape Ann acquired its NutraMax stock at negotiated prices and proceeded to take an active role in the company's affairs. In contrast, the new plaintiffs purchased their shares on

the open market at a much wider range of times and prices, and thereafter were purely passive investors. Clearly, Cape Ann and the new plaintiffs had different vantage points from which to observe how NutraMax was being run. By the same token, they had different incentives and opportunities to investigate the ongoing fraud.

Given this broad disparity, we find it difficult to credit the new plaintiffs' blithe assertion that the filing of suit by Cape Ann gave Deloitte notice that the new plaintiffs also would sue. Cape Ann's complaint was not couched as a class action — and on these facts, Deloitte had no reason to believe that Cape Ann was speaking on behalf, or acting to the behoof, of other shareholders. In fact, as the district court noted, Cape Ann, 171 F. Supp. 2d at 29-30, Cape Ann has no beneficial interest whatever in the claims of the new plaintiffs. Similarly, the new plaintiffs harbor no beneficial interest in Cape Ann's claims, save for their desire to ride piggyback on Cape Ann's filing date.[7] And the parties' injuries, although arising out of the same set of occurrences, are completely separate and distinct. Accordingly, Deloitte could not have had notice that the injuries of the one were in any way dependent upon the existence of the other. Cf. Williams v. United States, 405 F.2d 234, 239 (5th Cir. 1968) (holding that since

---

[7]Far from being beneficially interested in one another's claims, the two groups of plaintiffs, as shareholders in a bankrupt corporation, may have adverse interests.

mother's derivative loss-of-services claim predictably arose from tortious injury to son, defendant was put on notice because the "circumstances of these individuals was such as would reasonably indicate a likelihood that the parent would incur losses of a recoverable kind").

The short of the matter is that the amended complaint does not allege any facts showing that Cape Ann and the new plaintiffs were linked through any preexisting relationship. This is a decisive consideration because the absence of a sufficient identity of interest between Cape Ann and the new plaintiffs resulted in a lack of fair notice to Deloitte. The Supreme Court has emphasized that "notice within the limitations period" is the linchpin of a Rule 15(c) analysis. Schiavone v. Fortune, 477 U.S. 21, 31 (1986). In our view, lack of notice and unfair prejudice go hand in hand. Thus, while Cape Ann's original complaint may have given Deloitte reason to fear that other shareholders might pursue similar claims, such minimal notice hardly suffices to avert undue prejudice to Deloitte within the meaning of Rule 15(c)(3) should we permit relation back. That prejudice is obvious: it is the prejudice "suffered by one who, for lack of timely notice that a suit has been instituted, must set about assembling evidence and constructing a defense when the case is already stale." Nelson, 60 F.3d at 1014-15.

-32-

To say more on this point would be supererogatory. Where, as here, real issues of fact still hover as to what representations and reassurances were proffered and who owed what duties to whom, the accession of new plaintiffs and claims will likely entail new legal theories and tactics against which Deloitte must defend and a geometric increase in its potential liability. When this occurs long after the statute of limitations has run, prejudice is manifest. The Third Circuit summed it up well:

> Statutes of limitations ensure that defendants are protected against the prejudice of having to defend against stale claims . . . . In order to preserve this protection, the relation-back rule requires plaintiffs to show that the already commenced action sufficiently embraces the amended complaint so that defendants are not unfairly prejudiced by these late-coming plaintiffs and that plaintiffs have not slept on their rights.

Id. at 1014 (citation and internal quotation marks omitted); see also Leachman, 694 F.2d at 1309 (emphasizing that defendants are entitled to "have notice of who their adversaries are").

The fact that the new plaintiffs have assigned their claims to the Trust does not alter the decisional calculus. An assignee ordinarily stands in the shoes of the assignor. E.g., In re SPM Mfg. Corp., 984 F.2d 1305, 1318 (1st Cir. 1993); R.I. Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co., 789 F.2d 74, 81 (1st Cir. 1986). Consequently, an assignee cannot maintain a claim in the face of a limitations defense that would have trumped the same claim had it been brought by the assignor. See Ass'n of

-33-

Commonwealth Claimants v. Moylan, 71 F.3d 1398, 1402 (8th Cir. 1995); Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc., 452 F.2d 1346, 1357 n.69 (D.C. Cir. 1970). That is as it should be. Were the law otherwise, the efficacy of a limitations defense could be destroyed by the simple expedient of assigning the claim in question to a party who already had sued the defendant.

To summarize, we hold, based upon the lack of a sufficient identity of interest between Cape Ann and the new plaintiffs, that the latter are precluded from invoking Rule 15(c)(3) in order to salvage their time-barred federal securities claims. Because this holding forecloses the only available route to recovery, we affirm the district court's dismissal of those claims.

## V. CONCLUSION

We need go no further. To recapitulate, we reverse the district court's dismissal of Cape Ann's Rule 10b-5 claim because it cannot be said, as a matter of law, that the statute of limitations expired before Cape Ann sued. Conversely, we uphold the district court's refusal to permit the new plaintiffs to hitch their wagon to Cape Ann's star because the new plaintiffs do not share a sufficient identity of interest with Cape Ann. We direct the district court, on remand, to reconsider the dismissal of the supplemental state-law claims, but we take no view as to whether the court should exercise supplemental jurisdiction over those

-34-

claims.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (emphasizing that exercise of pendent jurisdiction is at the district court's discretion); Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1176 (1st Cir. 1995) (similar).

**Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion**.  **All parties shall bear their own costs**.