Paul G. BAMBERG, et al., Plaintiffs,

v.

SG COWEN Defendant.

Janet Baker, et al., Plaintiffs,

v.

SG Cowen Defendant.

Janet Baker, et al., Plaintiffs,

v.

KPMG Singapore Defendant.

Nos. CIV.A.02–CV–10304–PB,
CIV.A.02–CV–10367–PB.

United States District Court,
D. Massachusetts.

Dec. 9, 2002.

Richard E. Bennett, Jack R. Pirozzolo, Willcox, Pirozzolo & McCarthy, Boston, MA, Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Wilmington, DE, James J. Nicklaus, Willcox, Pirozzolo & McCarthy Professional Corporation, Kenneth J. Fishman, Fishman, Ankner & Horstman, LLP, Boston, MA, Kurt F. Gwynne, Reed Smith LLP, John G. Harris, Wilmington, DE, Terence K. Ankner, Fishman, Fishman, Ankner & Horstman, LLP, Boston, MA, Karen C. Dyer, Boies, Schiller & Flexner LLP, Orlando, FL, Robert A. Nicholas, Michael T. Scott, Alan K. Cotler, Sean M. Halpin, Tracy Zurzolo–Frisch, Joan A. Yue, Reed Smith, LLP, Philadelphia, PA, for Plaintiffs.

Anthony M. Feeherry, Goodwin Procter LLP, Boston, MA, Susan E. Kaufman, Heiman, Aber, Goldlust & Baker, Wilmington, DE, James O. Fleckner, Hutchins, James S. Dittmar, Wheeler & Dittmar, Douglas H. Meal, Emily F. Klineman, Ropes & Gray, Pamela E. Berman, Schnader, Harrison, Goldstein & Manello, LLP, Boston, MA, Daniel Waxman, Eric Rieder, Bryan Cave LLP, New York City, Nelson Callahan, John A.D. Gilmore, Hill & Barlow, Boston, MA, Stephen E. Jenkins, Ashby & Geddes, Wilmington, DE, Douglas F. MacLean, Latham & Watkins, Newton, MA, Peter W. Devereaux, Latham & Watkins, Los Angeles, CA, Lewis H. Lazarus, Morris, James, Hitchens & Williams, Wilmington, DE, David H. Braff, Bradley A. Harsch, Sullivan & Cromwell, New York City, Phillip L. Graham, Jr., Stephanie G. Wheeler, Sullivan & Cromwell, New York City, Theodore Edelman, Sullivan & Cromwell, London EC4A 1AN, England, Jeff Hammel, Latham & Watkins, New York City, Matthew J. Matule, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Paul J. Lockwood, Skadden, Arps, Slate, Meagher & Flom, Wilmington, DE, George A. Zimmerman, Joanne Gaboriault, Skadden, Arps, Slate, Meagher & Flom, New York City, Henry A. Heiman, Heiman, Aber Goldlust & Baker, Wilmington, DE, Thomas W. Evans, Janet B. Fierman, Robert M. Cohen, Cohen & Fierman, LLP, Gregg Shapiro, Kevin J. Lesinski, Choate, Hall & Stewart, Boston, MA, Diem–Suong T. Nguyen, William Fenrich, Michael P. Carrol, Davis Polk & Wardwell, New York City, William R. Moorman, Craig & Macauley, P.C., Robert J. Kaler, Gadsby & Hannah LLP, Michael J. Stone, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

Plaintiffs allege that defendants SG Cowen Securities Corporation ("S.G.Cow-

en"), an investment analyst and banker, and KPMG Singapore, a Singapore based accounting firm, committed a securities fraud that induced plaintiffs to trade their $300 million interest in Dragon Corporation ("Dragon") for stock in Lernout & Hauspie Speech Products, N.V. ("L & H"), which became essentially worthless when the alleged fraud came to light several months later. The Baker and Bamberg complaints, both arising out of the same stock-swap transactions, assert claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, and under common law.

The Court discussed at length the legal framework and factual background of § 10(b) claims against L & H's four inside officers in *In re Lernout & Hauspie Sec. Litig.*, 208 F.Supp.2d 74 (D.Mass.2002) ("*Lernout I* "), against L & H's outside auditors *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d 152 (D.Mass.2002) ("*Lernout II* "), and against L & H's Audit Committee and Board of Directors in *In Re Lernout & Hauspie Sec. Lit.*, 286 B.R. 33 (D.Mass.2002) ("*Lernout III* "). Familiarity with these opinions is assumed.

Both defendants have moved to dismiss. After hearing and a review of the extensive submissions, the Motions to Dismiss are *ALLOWED* in part and *DENIED* in part as to SG Cowen, and *ALLOWED* as to KPMG Singapore.

### A. SG Cowen

#### 1. Sufficiency of the Allegations

■ The *Baker* amended complaint alleges the following facts. SG Cowen was an investment banker and financial advisor to L & H from the time the company went public in 1995. On June 7, 2000, the Bakers, who were the majority shareholders in Dragon, purchased L & H stock. In the all-stock transaction, Dragon was merged into a U.S. subsidiary of L & H known as

L & H Holdings USA, Inc. The merger agreement is dated March 27, 2000.

SG Cowen had an extensive relationship with L & H. In its 1999 Annual Review, SG Cowen describes its role in co-managing L & H's $40 million initial public offering in 1995, helping it acquire two language translation companies, initiating three more capital raising deals in 1996 and 1997, and rendering opinions on other deals such as the Bumil transaction in Korea on September 13, 1999. It touted itself as "L & H's exclusive financial adviser." It not only handled the Dragon transaction, but also the larger Dictaphone deal. Cowen billed over $800,000 in transaction fees with L & H in 1998 alone.

SG Cowen analysts Robert Stone and Ben Howe both were members of SG Cowen's investment banking team and were active in the Dragon/L & H stock-swap negotiations. Also active in the Dragon negotiations was Dan Blake, a former SG Cowen analyst who had accepted a position at L & H Investment Co. ("LHIC"), a company formed and controlled by L & H inside officers Joseph Lernout and Pol Hauspie for the purpose of funding certain L & H "related parties." After joining LHIC, Blake continued to work closely with SG Cowen, as part of the L & H/Dragon deal team.

According to the complaint, Stone and other SG Cowen representatives were aware of, approved, and even devised some of L & H's related party transactions. As outlined in *Lernout I*, these transactions constitute one of the three cornerstones of the securities fraud allegations: L & H improperly recognized and inflated revenue from strategic partners who were not unaffiliated customers, but related parties. On October 13, 2000, Joseph Lernout told Janet Baker that Stone, a managing director and senior analyst for SG Cowen,

knew about and had a direct role in establishing third-party affiliated companies through which research and development expenses could be hidden from L & H's bottom line. (Baker Amended Complaint ¶ 98.) Stone allegedly told Lernout, "There's nothing wrong with working smart." (*Id.,* ¶ 370.)

Despite this knowledge of the related party transactions, SG Cowen issued a series of analyst reports prior to the Dragon deal promoting L & H as a good investment opportunity and a "strong buy." (*Id.,* ¶¶ 100–102.) On January 5, 2000, SG Cowen continued to promote L & H as a "strong buy with revenues growing by fivefold, from about $100 mm in 1997 to our 2000 estimate of slightly over $550 mm." (*Id.,* ¶ 101). SG Cowen continued to make such laudatory assessments of L & H until the fall of 2000 when L & H publicly disclosed that it was being investigated by the SEC. (*See Id.,* ¶ 370.)

In the course of negotiations for the Dragon deal SG Cowen, through Stone, "repeatedly advocated L & H's securities" directly to the plaintiffs, "specifically citing L & H's strong revenue growth." (*Id.,* ¶ 187.) Finally, to advance the Dragon deal, SG Cowen gave to the plaintiffs a "Deal Book" containing "extensive financial reporting and projections regarding L & H's revenue and financial status . . . [which] Cowen either knew or was reckless in not knowing . . . was false." (*Id.,* ¶ 189.) The Bakers also relied on the SG Cowen analyst reports, including the February 2000 report, which contained 1999 financial information. This was completed *prior* to KPMG's signing off on the 1999 audit in April 2000.

To buttress allegations that Stone and L & H were in cahoots, plaintiffs allege that Stone announced that he had personally visited and inspected L & H's Korean operations and confirmed they were real the day after *The Wall Street Journal* article reported discrepancies in L & H's representations about its purported Korean customers (¶ 369). As it turns out, most of these customers were in fact fictitious.

### 2. *Puffery*

Defendant argues that plaintiffs have not alleged facts which, even if proved true, are sufficient to constitute a § 10(b) violation. Defendant argues that its statements describing L & H as a "strong buy" and other similar statements cannot as a matter of law give rise to liability. Defendant characterizes these and other statements made directly to plaintiffs as mere corporate "puffery," which lack the specificity or seriousness sufficient to constitute the making of a false statement. *See Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996) ("[C]ourts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."); *In re Peritus Software Services, Inc. Sec. Litig.,* 52 F.Supp.2d 211, 220 (D.Mass.1999) (finding statements by corporate officers regarding "unprecedented market demand" of company product to be mere puffery).

However, SG Cowen's financial reports, the deal book, the "strong buy" recommendations, and the oral representations concerning past revenue, all presented by respected outside investment analysts, are precisely the kind of hard information that a "reasonable investor could find . . . important to the total mix of information available." *Shaw,* 82 F.3d at 1217. *Cf. In re Westell Technologies, Inc.,* 2001 WL

1313785, *12 (N.D.Ill.2001) (denying dismissal in securities fraud claim based in part on allegations that misleading statements caused analysts to rate stock as "strong buy"); *In re Livent*, 148 F.Supp.2d 331, 344 (S.D.N.Y.2001)(same). These hard numbers concerning past revenue are hardly fluff.

### 3. Scienter

Again, the pitched battle involves whether the Amended Complaint sufficiently alleges scienter against SG Cowen. Defendant claims that the allegations are too thin to support a strong inference that it knew or was reckless in not knowing that the statements it made about L & H were false.

Plaintiffs emphasize that Lernout specifically implicated SG Cowen's Robert Stone as a knowing participant in the "related party" fraud against L & H. (Baker Amended Complaint ¶ 98.) If this is true, then SG Cowen's statements, both in analyst reports and to the Baker's directly during the Dragon due diligence inquiry, were knowingly false. (*Id.,* ¶ 187.) While SG Cowen minimizes the weight that should be given to this accusation because Lernout is facing criminal prosecution, all reasonable inferences must be drawn in plaintiffs' favor. In addition, although SG Cowen claims it reasonably relied on KPMG's reports to the Bakers in March 2000, SG Cowen's own deep involvement with L & H undermines this argument, at least at the pleading stage.

The Court relies on the following factors in concluding that the Amended Complaint creates a sufficiently strong inference of scienter: (1) the alleged statement by Lernout to the Bakers concerning Stone's knowledge of and assistance in structuring the related party transactions; (2) the extremely close, lengthy and lucrative relationship between SG Cowen and L & H from the time L & H went public in 1995 through the negotiations and representations made during the Dragon deal in 2000; (3) Stone's assistance in fending off concerns raised by the *Wall Street Journal* articles involving the largely fictitious Korean revenue; and (4) the role of Blake, a former SG Cowen analyst and current LHIC official, on the deal team. The motion to dismiss the § 10(b) claims against SG Cowen is **DENIED**.

### 4. Statute of Limitations as to the Bamberg's § 10(b) Claim Against SG Cowen

SG Cowen asserts that the Bamberg plaintiffs' § 10(b) claims against it are time-barred under the one year statute of limitations applicable to Rule 10b–5 claims. The Bambergs, minority shareholders in Dragon, filed their original complaint, which did not name SG Cowen on June 6, 2001, the same day the Bakers filed their complaint, which did. The Amended Complaint adding SG Cowen was filed on May 1, 2002. The Baker and Bamberg complaints, both arising from the Dragon transaction, were consolidated by order of the Court.

Section 10(b) claims "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). "The statute of limitations does not begin to run until 'the time when the plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains.' " *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222, 224 (1st Cir. 1997) (internal citation omitted).

■ The First Circuit has developed a two-step procedure to apply this analytic framework to the facts of specific cases. The first is to determine the time when "storm warnings" were evident that would put a reasonable investor on notice of a possible fraud. *See Young v. Lepone,* 305 F.3d 1, 8 (1st Cir.2002). Once the timing of such warning signs is established, the second step is to determine whether after the signs emerged a plaintiff was reasonably diligent in investigating them. *See id.* "[F]ollowing the receipt of sufficient storm warnings, a plaintiff's cause of action is deemed to accrue on the date when, exercising reasonable diligence, she would have unearthed the fraud." *Id.*

### a. Storm Warnings.

■ Although they filed their initial complaint on June 6, 2001, the Bamberg plaintiffs did not attempt to add SG Cowen as a defendant until May 1, 2002. The defendants argue that the plaintiffs were put on inquiry notice of a claim against SG Cowen when the *Wall Street Journal* published an article on August 8, 2000, raising serious questions about the veracity of L & H's financial reports. A series of such articles continued in the *Wall Street Journal* throughout the fall of 2000. During the month of November, 2000, L & H made a number of public pronouncements regarding misstatements and omissions in previously reported financial statements. On November 17, 2000 L & H's auditor, KPMG, withdrew its 1998 and 1999 clean audits of L & H and announced that those audits were no longer reliable. On December 19, 2000, L & H's Audit Committee's findings were reported in the *Wall Street Journal,* chronicling the possible misrecording of up to $277 million in revenue on L & H's books. On April 27, 2001, L & H's principle insiders, Lernout, Hauspie, and Willaert were arrested in Europe for stock manipulation. In short, through-out the fall of 2000 and into the spring of 2001 there were more than "storm warning[s]" afoot—the winds were howling, the rains were pouring, and reasonably prudent investors were battening down the hatches to preserve their legal rights.

■ The plaintiffs assert that they did not know that SG Cowen had made misrepresentations with scienter even when the storm warnings were seen, and thus did not know at that time that they had a viable claim against SG Cowen, as opposed to the other defendants they did name. However, once the defendant has shown the presence of storm warnings, the plaintiff must "counter with a showing that she fulfilled her corresponding duty of making a reasonably diligent inquiry into the possibility of fraudulent activity." *Id. See also Slavin v. Morgan Stanley & Co.,* 791 F.Supp. 327, 331 (D.Mass.1992) (holding that summary dismissal on statute of limitation grounds is appropriate where plaintiff fails to meet "burden of alleging *facts* which could lead to an inference of reasonable diligence" in investigating storm warnings of securities fraud).

No such showing has been made here. The plaintiffs do not, and cannot, argue that they were unaware that the storm warnings in the fall of 2000 potentially implicated SG Cowen, for the Bambergs' own complaint is predicated on financial misrepresentations that SG Cowen made directly to them during the Dragon deal in February and March 2000. The Bakers filed their virtually identical case against SG Cowen on June 6, 2001. To be sure, a plaintiff should not be encouraged to clone another's complaint if unsure about its factual basis. Rule 11 requires more. However, the Bambergs have pointed to no reasonable investigation, or additional evidence gathered, that has finally clinched their belief that they have a viable claim

against SG Cowen. Rather, the amended complaint seems to be based on the same allegations that were available a year before they filed their amended complaint.

### b. Relating Back Under Rule 15(c)

The Bamberg plaintiffs next argue that under Fed.R.Civ.P. 15(c) their claim may relate back either to the time at which the Bamberg's original complaint (not naming SG Cowen) was filed, or to the time at which the Baker plaintiffs original complaint was filed, which did name SG Cowen.[1]

■ The Bamberg's claim against SG Cowen may not relate back to the date of their original complaint because their failure to name SG Cowen as a defendant was not due to "a mistake concerning the identity" of SG Cowen, but rather a perceived lack of sufficient evidence. Rule 15(c) does not allow for relating back under such circumstances. *See Ramirez v. Garcia,* 898 F.2d 224, 229 (1st Cir.1990) (holding that Rule 15(c) did not bring amendment within the limitation period where there had been no mistake in identity but an absence of evidence).

■ Alternatively, the Bambergs argue that the claim relates back to the date of the original Baker filing because the Baker and Bamberg cases have been consolidated. However the Court consolidated the case only for case management purposes, for example, to eliminate duplicative pleadings in this tree-killing litigation. *See Morin v. Trupin,* 778 F.Supp. 711, 733–34 (S.D.N.Y.1991)("[W]hile Rule 15 may be said to have 'substantive' objectives, consolidation is a trial management device for which the policies of Rule 15 have no relevance.") A complaint that would be time-barred if it were being tried alone cannot be resuscitated by dint of its consolidation with another case. *See id.*

The Bambergs argue that they should be treated like new plaintiffs added by amendment. While Fed.R.Civ.P. 15 does not explicitly address adding plaintiffs, most courts agree that in some circumstances claims brought by a new plaintiff, who is added by amendment to an existing complaint, may relate back to the filing date of the pending litigation. *See* 6A Wright, Miller, & Kane, *Federal Practice and Procedure* § 1501, at 154 (2d ed.1990); *Olech v. Village of Willowbrook,* 138 F.Supp.2d 1036, 1041–43 (N.D.Ill.2000) (dispensing with the literal requirements of Rule 15(c) and focusing on questions of fair notice and absence of undue prejudice to the defendant); *Sokolski v. Trans Union Corporation,* 178 F.R.D. 393, 398 (E.D.N.Y.1998) (allowing new class of plaintiffs who had not sued defendant to join and relate back to date of original plaintiff filing, where underlying facts were the same and defendant not prejudiced); *Andujar v. Rogowski,* 113 F.R.D.

---

1. Fed.R.Civ.P. Rule 15(c) states that:

   An amendment of a pleading relates back to the date of the original pleading when
   (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
   (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
   (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

151, 158 (S.D.N.Y.1986) (allowing relation back in § 1983 case where new plaintiffs had not previously filed any claim in connection with the same underlying facts forming basis of original plaintiff's complaint). However, a consolidation of pending cases for case management purposes is not tantamount to an amendment of a single pending case under Fed.R.Civ.P. 15(c). *See Morin*, 778 F.Supp. at 733–34 (holding that plaintiff's new claim in pending case could not relate back to the date of original filing of separate case with which plaintiff's case was consolidated); *In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F.Supp. 1352, 1363–65 (W.D.N.Y.1996) (same).

For the foregoing reasons the Bamberg plaintiffs' § 10(b) claims against SG Cowen are time-barred and are *DISMISSED.*

### 5. The State Law Claims Against SG Cowen

The Baker and Bamberg plaintiffs have both brought state law claims against the defendants based on common law fraud and negligent misrepresentation. SG Cowen has not briefed a motion to dismiss these claims. The common law fraud claim survives because its elements are substantially the same as the § 10(b) claim; the successful fraud pleading also satisfies the less demanding elements of a negligent representation claim. The Court will assert supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c), over the state law claims of the Bambergs which have been filed within the three-year statute of limitations and have a common core of facts. Hence, the motion to dismiss these state claims is *DENIED.*

### B. KPMG Singapore

The Baker plaintiffs allege that KPMG Singapore participated in the L & H fraud against them. The Amended Complaint alleges the following claims against KPMG Singapore: violations of § 10(b) (Sixth Claim); § 20(a) control liability (Claim Seven); § 10(b) claim based on agency (Claim Eight); · common law aiding and abetting fraud (Claim Twelve); and negligent misrepresentation (Claim Thirteen).

### 1. Sufficiency of the Allegations

██ KPMG Singapore and KPMG Korea were responsible for reviewing, auditing and certifying L & H's financial records for L & H's Korean and Asian operations. (Baker Amended Complaint ¶ 6.) Plaintiffs allege that KPMG Singapore was aware that revenue from L & H Korea's contracts should not have been recognized because the Korean L & H customers were typically start ups with no ability to pay the multi-million dollar license fees called for by the L & H contracts that L & H was booking as revenue. These Korean licensing agreements contained purported fees of as much as $19 million apiece, which was out-of-line with licensing fees generally charged in the speech recognition industry. Despite this knowledge, Plaintiffs claim KPMG Singapore participated in the preparation of the clean audit, which did recognize the licensing revenues, used in the Dragon transaction.

The key paragraph in the Amended Complaint against KPMG Singapore alleges that

KPMG Singapore participated in the audit and upon information and belief actually prepared portions of the financial reports that were part of at least KPMG's 1999 audit report of L & H. This information and belief is based on *inter alia* the January 25, 2000 fax of Phillip Lee in KPMG Singapore to KPMG Belgium addressing whether "we" (*i.e.,* KPMG Singapore) can give an

'unqualified audit report,' as well as other facts described herein.

(*Id.*, ¶ 122.) Because this securities fraud claim is premised primarily on the January 25, 2000 fax, and the attached memorandum, an analysis of the allegation must begin with an examination of those documents. Addressing the subject "Lernout & Hauspie Asia Pte Ltd Audit for year ended 31 December 1999," the fax, from KPMG Singapore auditor Phillip Lee to KPMG Belgium's Stephen Huysman, states:

> Please note that the group has not finalized its licensing agreements. Until this is done, we are not in a position to issue an unqualified audit report.

The memorandum attached to the fax lists sixteen companies, most incorporated in Singapore, that had over $100,000 in outstanding balances for more than 90 days, and explained that these were due to a contract dispute over the goods and service tax ("GST") portion of the contracts. The memo explained, "Apparently, it was not mentioned in the contracts that there is GST on the up-front technology fee. Thus, the companies have withheld payment of the GST portions." The memorandum voices further reservations about booking fees owed to L & H: "If we do not get satisfactory proof of probable receipts of the amounts owed by the above debtors, an appropriate provision will be required before finalization of the statutory financial statements." The memorandum cites as an outstanding matter "trade debtors confirmations," and concludes, "We are not in a position to issue an unqualified audit

opinion until the auditor issues mentioned in paragraph 3 above are finalized."

On January 26, 2000,December 6, 2002 KPMG Singapore's Lee sent another email to KPMG Belgium auditors Stefan Haussmann and William Van Aerde, which expressed "some doubt" about the collectability of a $2.6 million receivable outstanding against Four–One–One.com, an L & H customer, stating, "In our view, the conditions for revenue recognition appear to have been met except that there is now an issue of collectibility of the outstanding amount receivable." (*Id.*, ¶ 153.) Despite this admonition, KPMG Belgium recognized the full $45 million contract amount for this customer, including the $2.6 million outstanding debt, as revenue in the second quarter of 1999.[2]

KPMG Singapore auditors were also appraised of concerns that KPMG Belgium itself had about L & H's financial situation in an email on January 27, 2000. The email, written by KPMG Belgium's Stephen Huysman to Lee of KPMG Singapore and Oh Bum of KPMG Korea, seeks clarification concerning a $25 million lump-sum payment that was apparently made to L & H by a single entity—referred to in the email as "LDS"—on behalf of several of L & H's licensees in Asia. "Can either of you confirm who is behind LDS? Is this a legal entity or not? Where did the 25 million come from? Who authorized payment? What bank account was it transferred from? What exactly does the 25 million $ cover?" (*Id.*, ¶ 164) The email goes on to point out to Lee the fact that several purported L & H customers appeared to have exactly the same business address in Sing-

---

**2.** On February 15, 2000, Stefan Haussmann of KPMG Belgium sent an L & H confirmation letter to Four-one-one.com acknowledging an extended payment plan on the outstanding $2.6 million, under which 20 percent of the balance would still remain unpaid on December 31, 2000, a full year-and-

a-half after the revenue had been recognized. KPMG Belgium did not receive a signed confirmation of the payment plan by the customer during the relevant time period. (The complaint is unclear whether the signed confirmation was ever received).

apore. Huysman asks Lee if he is aware of any actual "operational activity" on the premises. The amended complaint does not report a response to this inquiry. In fact, on June 22, 2000—after the Dragon deal was consummated—Huysman again wrote to Lee asking him to "send someone down to the address of these companies to see if they are operational and appear proper companies [sic] and not just a post office box." (*Id.*, ¶ 172.)

Plaintiffs fault KPMG Singapore for, among other things, failing to seek confirmation of L & H contracts from Korean customers. If this had been done, they would have discovered, as did the *Wall Street Journal*, that nearly half of L & H's customers denied the existence or magnitude of a relationship claimed by L & H. Also, an audit of L & H bank balances in Korea would have disclosed that $106 million or more was inaccessible as a consequence of factoring receivables from Korean contracts with recourse to L & H's Korean bank accounts. (*Id.*, ¶ 269). In 1999, L & H reported that revenues in Singapore/Korea rose from a mere $29,000 in 1998 to $80.3 million in 1999, making these revenues higher than those of any other geographic area. As it turns out, a stunning 100 percent of the revenue recognized on L & H's Korean contracts was improperly recognized.

In their claim alleging a violation of § 10(b) of the Securities Exchange Act, Plaintiffs contend that KPMG Singapore (and Korea) were "integrally involved" in the fraudulent audits of L & H's financial statements for one or more of years 1997, 1998, and 1999. The First Amended Complaint asserts that KPMG Singapore knew it was making a misleading statement when it "nonetheless ultimately issued what KPMG Singapore described as its 'unqualified audit report'" on L & H Asia. (*Id.*, ¶ 167.) Plaintiffs allege KPMG Sing-

apore violated U.S. GAAP in its report, and that it made "specific oral representations to and for the benefit of the parties related to L & H." Essentially, the claim against KPMG Singapore is difficult to parse because, in conclusory fashion, it conflates the activities and statements of KPMG Singapore and KPMG Belgium, and more generally the activities of all the KPMG entities.

To the extent plaintiffs seek to impose liability on KPMG Singapore under the theory that all KPMG entities are one worldwide firm or all agents of one another, the Court has rejected that approach. *See Lernout II*, 230 F.Supp.2d at 170–71. This First Amended Complaint contains no new allegations to alter this conclusion. There is no allegation to support a reasonable inference that KPMG Singapore (or KPMG Korea) exercised control over the KPMG Belgium audit report.

With respect to KPMG Singapore's own actions and statements, the § 10(b) claim against KPMG Singapore are essentially the same as were made by the Filler plaintiffs against KPMG Singapore in *Lernout II*. There the Court found the pleaded facts insufficient to support a claim that KPMG Singapore had made a misleading statement within the meaning of § 10(b) as interpreted by *Central Bank:*

> The [plaintiffs] allege that KPMG Singapore gave KPMG Belgium its "professional opinion that L & H's Singapore operations and revenues were presented fairly in conformity with U.S. GAAP," a material misrepresentation that was later disseminated to the market as part of the 1999 audit report over the signature of KPMG Belgium. They present three alternative theories to support liability on this basis: a) KPMG Singapore is liable for "its own fieldwork and conclusions communicated to the market over the signature of its sister entity,

KPMG Belgium"; b) KPMG Singapore substantially participated in misstatements made by a related entity; and c) the KPMG partners who participated in the March 22, 2000 conference call had actual and apparent authority to speak for KPMG Singapore. None of these theories is actionable based on this Court's reading of *Central Bank*. Even if KPMG Belgium partially relied on KPMG Singapore's conclusion that L & H's Singapore operations and revenues were fairly presented in issuing its "clean" audit report, there is no caselaw to support plaintiff's theory that KPMG Singapore made a material misstatement or omission upon which investors relied. Second, KPMG Singapore did not prepare, draft, edit or provide numbers for the audit. Its role was more akin to the "review and approval" allegations which no court has found sufficient to trigger liability after *Central Bank*. *Lernout II*, 230 F.Supp.2d at 170–71.

Plaintiffs argue that this rationale should not control because the Filler plaintiffs did not highlight the January 25th fax and memorandum in their presentations to this Court. But even when highlighted, the memo and report are still not evidence of a misleading statement within the meaning of § 10(b). Quite the contrary, these documents affirmatively flag collectibility issues. Plaintiffs do not seem to contend that the fax itself was misleading. Instead, they underscore the statement that until these collectibility issues are clarified, "*we are not in a position to issue an unqualified audit opinion.*" (Emphasis added). The use of the pronoun "we", plaintiffs contend, indicates that KPMG Singapore is responsible for the misleading audit report ultimately issued by KPMG Belgium. While there is a conclusory allegation that KPMG Singapore participated in preparing the clean audit, that allegation is vitiated by the fax and attached memo, which

decline to give an unqualified audit opinion. Nothing in the pleadings or referenced documentation here suggest a more fulsome involvement by KPMG Singapore in the audit similar to the roll-up-the-sleeves participation by KPMG LLP (KPMG U.S.), which allegedly prepared the actual written misrepresentations. The Motion to Dismiss the § 10(b) claim against SG Cowen is therefore *ALLOWED.*

### a. *Section 20(a) Claim (¶¶ 375–379)*

Plaintiffs also contend in conclusory fashion that KPMG Singapore (as well as KPMG Korea) exercised control over the "lead" audit parties and the parties "who exercised" final decision making authority with respect to the account located at various times in Belgium, the United States, and the United Kingdom. These allegations are self-contradicting. How can one party exercise control over another party which is both in the "lead" and "the final decision maker?" Nonetheless, just as the allegations are insufficient to support a claim that KPMG Belgium is an agent of KPMG Singapore, so too the allegations of section 20(a) control are insufficient.

### C. Common Law Aiding and Abetting Fraud (¶¶ 400–404)

■ "[U]nder Massachusetts law liability for aiding and abetting a tort attaches where: (1) the defendant provides 'substantial assistance or encouragement to the other party;' and (2) the defendant has 'unlawful intent, i.e., knowledge that the other party is breaching a duty and the intent to assist that party's actions.'" *Austin v. Bradley, Barry & Tarlow, P.C.*, 836 F.Supp. 36, 40 (D.Mass.1993) (quoting *Payton v. Abbott Labs*, 512 F.Supp. 1031, 1036 (D.Mass.1981)). *See also Margaret Hall Foundation v. Atlantic Financial Management, Inc.*, 572 F.Supp. 1475, 1482

(D.Mass.1983) (recognizing cause of action for aiding and abetting common law fraud in Massachusetts in case involving alleged fraudulent mismanagement of investment fund). "To establish a common law cause of action for aiding and abetting, plaintiffs must at least demonstrate some measure of 'active participation' and the knowing provision of substantial assistance ... to the principal's ... alleged fraud." *Schultz v. Rhode Island Hospital Trust National Bank*, 94 F.3d 721, 730 (1st Cir.1996) (citing *Spinner v. Nutt*, 417 Mass. 549, 556, 631 N.E.2d 542 (1994)).

■■■ A claim of aiding and abetting fraud must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). *See ABF Capital Management v. Askin Capital Management*, 957 F.Supp. 1308, 1328 (S.D.N.Y.1997) (explicating elements of aiding and abetting fraud in a securities case and imposing heightened pleading standard); *Morin*, 711 F.Supp. at 112 (S.D.N.Y.1989) ("[T]o the extent that the underlying primary violations are based on fraud, allegations of aider-abettor liability must meet the requirements of Fed. R.Civ.P. 9(b)."); *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 249–50 (D.Md.2000) (same).

■■■ The plaintiffs fail to plead with specificity allegations of fraud sufficient to substantiate their claim that KPMG Singapore substantially assisted or encouraged a fraud perpetrated by L & H Korea or KPMG Belgium against them. The January 25th fax and memo and the January 26th email from Lee to KPMG Belgium convey reservations and problems that KPMG Singapore had identified with respect to L & H's finances. It may have been fraudulent for KPMG Belgium to release (and L & H to promote) an audit that ignored or hid these reservations, but that fraud was not substantially assisted by the provision of the memo and report in the first place.

### 1. Negligent Misrepresentation (¶¶ 405–409)

■■■ "In order to recover for negligent misrepresentation, a plaintiff must prove that the defendant, in the course of his business, made a false representation of material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage." *Kitner v. CTW Transport*, 53 Mass.App.Ct. 741, 749, 762 N.E.2d 867, 873 (2002). Establishing liability for misrepresentation does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff. *See id.* A defendant who is negligent in providing "false information for the guidance of others in their business transactions" is subject to liability in tort even as to those with whom they are not in contractual privity, so long as the defendant had actual knowledge that their statements were going to be used and relied on by the particular plaintiff. *Nycal v. KPMG Peat Marwick, LLP.*, 426 Mass. 491, 495–97, 688 N.E.2d 1368, 1371–1372 (1998) (quoting Restatement (Second) of Torts § 552 (1977)); *North American Specialty Insurance v. Lapalme*, 258 F.3d 35, 38 (1st Cir.2001) (recognizing that Massachusetts law follows the Restatement).

Courts are split on whether Rule 9(b) should apply to negligent misrepresentation claims. *Compare Masso v. United Parcel Serv. of Am., Inc.*, 884 F.Supp. 610, 615 (D.Mass.1995) (holding Rule 9(b) not applicable) *with Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F.Supp. 49, 57 (D. Mass.1995) (opposite).

■■■ Even assuming that Rule 9(b) does not apply to negligent misrepresentation claims, because they sound in negligence more than in fraud, at a minimum, Rule 8 requires a plain and short state-

ment of the alleged misrepresentation. The plaintiffs have not alleged any facts that KPMG Singapore misrepresented, either orally or in writing, to them or to KPMG Belgium in the January 25, 2000 fax. KPMG Singapore may well have been negligent in failing to do the sleuth work that the *Wall Street Journal* undertook to discover the fraud. However, negligent misrepresentation requires a false statement. The claim of negligent misrepresentation is **DISMISSED.**

### ORDER

For the foregoing reasons, defendant SG Cowen's motion to dismiss the Bamberg plaintiffs' § 10(b) claim is **ALLOWED** (Docket No. 99), but the motion to dismiss the Bamberg's state law claims is **DENIED.** SG Cowen's motion to dismiss the Baker plaintiffs' complaint is **DENIED.** Defendant KPMG Singapore's motion to dismiss (Docket No. 29) is **ALLOWED.**